No. 25-2297

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

GLENN BOWDEN,
Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:24-cr-00143
The Honorable Judge Martha M. Pacold

BRIEF AND REQUIRED SHORT APPENDIX OF
DEFENDANT-APPELLANT, GLENN BOWDEN

FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF ILLINOIS
401 Main Street, Suite 1500
Peoria, Illinois 61602
Telephone: (309) 671-7891
Fax: (309) 671-7898
Email: Johanna_Christiansen@fd.org

THOMAS W. PATTON
Federal Public Defender

JOHANNA M. CHRISTIANSEN
Assistant Federal Public Defender

Attorneys for Defendant-Appellant,
GLENN BOWDEN

**ORAL ARGUMENT REQUESTED**

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2297

Short Caption: United States v. Bowden

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervener or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IS ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Glenn Bowden

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Johanna M. Christiansen, Thomas W. Patton, Hallie M. Bezner, Jeffrey J. Levine, Lawrence W. Levin, and Steven R. Hunter

(3) If the party, amicus or intervener is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervener's stock:

        N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Johanna M. Christiansen      Date: March 12, 2026

Attorney's Printed Name: Johanna M. Christiansen

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☐

Address: 401 Main Street, Suite 1500

      Peoria, Illinois 61602

Phone Number: (309) 671-7891          Fax Number: (309) 671-7898

E-Mail Address: Johanna_Christiansen@fd.org

**TABLE OF CONTENTS**

**PAGE**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ........................................................ii

JURISDICTIONAL STATEMENT ...................................................................................1

ISSUES PRESENTED FOR REVIEW .............................................................................2

    I.    Whether the district court miscalculated the guidelines range by using the wrong guidelines section for the base offense level associated with Count 3? ..........................................2

    II.    Whether this matter must be remanded based on the district court's imposition of a sentence on Count 3 above the statutory maximum sentence? .........................................2

STATEMENT OF THE CASE ..........................................................................................3

    I.    Mr. Bowden's Prior Federal Case. ...................................................3

    II.    Offense Conduct in the Instant Case and Superseding Indictment. ........................................................................................4

    III.    Jury Trial and Guilty Plea. ...............................................................6

    IV.    Presentence Investigation Report. ..................................................8

    V.    Sentencing. .......................................................................................11

SUMMARY OF ARGUMENT.......................................................................................14

ARGUMENT ...................................................................................................................15

    I.    The district court miscalculated the guidelines range by using the wrong guidelines section for the base offense level associated with Count 3. ...........................................15

        A.    Standard of Review. ..............................................................15

        B.    Mr. Bowden's conviction under § 1001(a)(2). .......................18

        C.    The district court erroneously used § 2J1.2(a) to calculate the base offense level. ............................................19

II. This matter must be remanded based on the district court's imposition of a sentence on Count 3 above the statutory maximum sentence. ...........................................................26

    A. Standard of Review. ...............................................................26

    B. The sentence for Count 3 was above the statutory maximum. ...............................................................................27

CONCLUSION...........................................................................................30

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B) .................31

**TABLE OF AUTHORITIES**

**PAGE**

**Cases**

*United States v. Anderson*, 604 F.3d 997 (7th Cir. 2010)..................................................18

*United States v. Bah,* 439 F.3d 423 (8th Cir. 2006) .................................................22, 23

*United States v. Carpenter,* 576 Fed. Appx. 610 (7th Cir. 2014) .................................21

*United States v. Clark*, 535 F.3d 571 (7th Cir. 2008) .......................................................26

*United States v. Daddino,* 5 F.3d 262 (7th Cir. 1993) .....................................................28

*United States v. Dridi,* 952 F.3d 893 (7th Cir. 2020) ......................................................17

*United States v. Garcia*, 580 F.3d 528 (7th Cir. 2009)......................................................16

*United States v. Garcia,* 590 F.3d 308 (5th Cir. 2009)...............................................21, 23

*United States v. Genao,* 343 F.3d 578 (2d Cir. 2003) ...............................................22, 23

*United States v. Gibson*, 356 F.3d 761 (7th Cir. 2004) ..............................................26, 28

*United States v. Griego,* 837 F.3d 520 (5th Cir. 2016) ...............................................24, 25

*United States v. Hammond,* 996 F.3d 374 (7th Cir. 2021) ........................................17, 18

*United States v. Hathaway*, 882 F.3d 638 (7th Cir. 2018)................................................16

*United States v. Hernandez,* 44 F.4th 1053 (7th Cir. 2022) ...........................................16

*United States v. Hyatt,* 28 F.4th 776 (7th Cir. 2022)................................................15, 17

*United States v. Jaimes-Jaimes,* 406 F.3d 845 (7th Cir. 2005) ...........................17, 25, 26

*United States v. Jumah,* 599 F.3d 799 (7th Cir. 2010) ....................................................15

*United States v. Kim,* 95 Fed. Appx. 857 (9th Cir. 2004)........................................23, 25

*United States v. Lee,* 77 F.4th 565 (7th Cir. 2023)...........................................................28

*United States v. McClain,* 16 F.4th 487 (7th Cir. 2021)...................................................28

*United States v. Moody,* 770 F.3d 577 (7th Cir. 2014) ....................................................27

*United States v. Nucera,* 67 F.4th 146 (3d Cir. 2023)......................................................23

*United States v. Olano,* 507 U.S. 725 (1993) ...................................................................15

*United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005) ................................................ 28

*United States v. Pawlinski*, 374 F.3d 536 (7th Cir. 2004) ........................................ 27, 28

*United States v. Robinson*, 964 F.3d 632 (7th Cir. 2020) ................................................ 15

*United States v. Turner,* 47 F.4th 509 (7th Cir. 2022) ...................................................... 16

*United States v. Verdone,* 121 Fed. Appx. 162 (7th Cir. 2005) ..................................... 22

## Statutes

18 U.S.C. § 1001 .............................................1, 6, 9, 14, 18, 19, 20, 21, 22, 23, 24, 25, 27

18 U.S.C. § 1033 ....................................................................................................................... 23

18 U.S.C. § 1204 ....................................................................................................................... 24

18 U.S.C. § 1341 ....................................................................................................................... 22

18 U.S.C. § 1342 ....................................................................................................................... 22

18 U.S.C. § 1343 ....................................................................................................................... 22

18 U.S.C. § 1503 ....................................................................................................................... 24

18 U.S.C. § 1505 .............................................................................................................23, 24, 25

18 U.S.C. § 1506 ....................................................................................................................... 24

18 U.S.C. § 1507 ....................................................................................................................... 24

18 U.S.C. § 1508 ....................................................................................................................... 24

18 U.S.C. § 1509 ....................................................................................................................... 24

18 U.S.C. § 1510 ....................................................................................................................... 24

18 U.S.C. § 1511 ....................................................................................................................... 24

18 U.S.C. § 1512 .............................................................................................................1, 6, 9, 23, 24, 25

18 U.S.C. § 1513 ....................................................................................................................... 24

18 U.S.C. § 1514 ....................................................................................................................... 24

18 U.S.C. § 1516 ....................................................................................................................... 24

18 U.S.C. § 1517 ....................................................................................................................... 24

18 U.S.C. § 1518 ....................................................................................................................... 24

18 U.S.C. § 1519 .................................................................................................24

18 U.S.C. § 1591 .................................................................................................20

18 U.S.C. § 1951 ...................................................................................................3

18 U.S.C. § 2 .........................................................................................................3

18 U.S.C. § 2232 .................................................................................................24

18 U.S.C. § 245 ...................................................................................................23

18 U.S.C. § 3231 ...................................................................................................1

18 U.S.C. § 3742 ...................................................................................................1

18 U.S.C. § 505 ...................................................................................................23

18 U.S.C. § 551 ...................................................................................................23

18 U.S.C. § 665 ...................................................................................................23

18 U.S.C. § 876 .............................................................................................1, 6, 9

26 U.S.C. § 7212 .................................................................................................24

28 U.S.C. § 1291 ...................................................................................................1

## Other Authorities

Fed. R. Crim. P. 35 .............................................................................................27

Fed. R. Crim. P. 36 .........................................................................................27, 28

U.S.S.G. § 1B1.1 .................................................................................................20

U.S.S.G. § 1B1.2 .................................................................................................20

U.S.S.G. § 2A6.1 ...................................................................................................8

U.S.S.G. § 2B1.1 ...........................................................................14, 20, 21, 22, 23, 25

U.S.S.G. § 2B1.3 .................................................................................................22

U.S.S.G. § 2F1.1 .................................................................................................23

U.S.S.G. § 2J1.2 .................................................................8, 14, 19, 20, 21, 22, 23, 25

U.S.S.G. § 3A1.2 ...................................................................................................8

U.S.S.G. § 3D1.2 .................................................................................................19

U.S.S.G. § 3D1.4..........................................................................................9, 20, 25

U.S.S.G., App. A..........................................................................................20, 21, 23

# JURISDICTIONAL STATEMENT

1.      The jurisdiction of the United States District Court for the Northern District of Illinois was founded upon 18 U.S.C. § 3231.  A grand jury sitting in the aforementioned district charged Defendant-Appellant Glenn Bowden by superseding indictment with mailing threatening communications in violation of 18 U.S.C. § 876(c), attempting to corruptly obstruct, influence, and impede an official proceeding in violation of 18 U.S.C. § 1512(c)(2); and false statements in violation of 18 U.S.C. § 1001(a)(2).

2.      The jurisdiction of the United States Court of Appeals for the Seventh Circuit is founded upon 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and is based upon the following particulars:

i.      Date of entry sought to be reviewed:  Sentence imposed on July 8, 2025; Judgment in a Criminal Case entered on July 11, 2025.

ii.      Filing date of motion for a new trial:  n/a;

iii.      Disposition of motion and date of entry:  n/a;

iv.      Filing date of notice of appeal:  July 21, 2025.

## ISSUES PRESENTED FOR REVIEW

I.  Whether the district court miscalculated the guidelines range by using the wrong guidelines section for the base offense level associated with Count 3?

II.  Whether this matter must be remanded based on the district court's imposition of a sentence on Count 3 above the statutory maximum sentence?

## STATEMENT OF THE CASE[1]

## I.     Mr. Bowden's Prior Federal Case.

On December 10, 2019, Mr. Bowden was charged in case number 19-cr-924 with one count of conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. §§ 1951(a) and 1951(b) and three counts of Hobbs Act robbery in violation of 18 U.S.C. §§ 1951(a) and 2.  (19R. at 1.)  These charges were based on his participation in a series of robberies of cell phone stores in Chicago.  (19R. at 116, p. 3-4.)  He pled guilty to all four counts on August 2, 2021.  (19R. at 115.)

United States Probation Officer Danielle Stern was assigned to author the Presentence Investigation Report for the 2019 case in August of 2021.  (T. Tr. 253.) In her recommendation to the district court, Stern recommended a sentence of 151 months.  (T. Tr. 273.)  The district court held a sentencing hearing on July 13, 2022, at which Stern was present.  (T. Tr. 264.)  Stern testified that, while the lawyers were arguing before the district court, Mr. Bowden turned to her and said, "you bitch, bitch, bitch" several times.  (T. Tr. 269.)  The district court imposed a total sentence of 110 months in prison, three years of supervised release, a special assessment of $400 and $56,462 in restitution.  (19R. at 140.)

---

[1] The following abbreviations are used herein: Record for 2019 case: "19R. at __;" Record on appeal for the instant case: "R. __;" Trial Transcript: "T. Tr. __;" Government's Trial Exhibits: "Gov't Ex. ___;" other hearing transcripts: "[date] Tr. at __;" and Appendix: "App. __."

## II. Offense Conduct in the Instant Case and Superseding Indictment.

After judgment was entered in the 2019 case, Mr. Bowden was incarcerated in United States Penitentiary McCreary in Pine Knot, Kentucky. (T. Tr. 275.) In October of 2022, Stern received a letter signed by Mr. Bowden, which stated, among other things that "The PSI you prepare [sic] it brought me so much pain that it would make a brass monkey shed tears." (T. Tr. 273; Gov't Ex. 105.) The letter also stated that "I've something other than this I would like to send to you! Be safe!" (Gov't Ex. 105.) Mr. Bowden was instructed not to contact Stern again. (T. Tr. 275.)

Stern then received an anonymous letter on May 23, 2023. (T. Tr. 284; Gov't Ex. 106.) The letter was in a pre-stamped, pre-printed envelope that the probation office routinely provided to detainees at MCC Chicago during presentence investigations. (T. Tr. 243; Gov't Ex. 100.) The letter called Stern a "bitch," a "pale face racist bitch," and a "slut." (Gov't Ex. 106.) The letter contained several threats of rape and sexual acts, including oral and vaginal sex. (Gov't Ex. 106.) The letter purported to be from her "mystery man" and warned, "I'll be watching you don't let me down because I always see you come down the hall until the next time you sexy bitch!" (Gov't Ex. 106.) Stern testified she was scared when she read the letter because she thought she had a stalker and thought someone was going to rape her or hurt her. (T. Tr. 295.)

While incarcerated at USP McCreary, Mr. Bowden filed two motions for compassionate release – one on December 6, 2022, and a second one on May 15, 2023. (T. Tr. 559-61; Gov't Ex. 200, 208.) On May 25, 2023, a letter was filed in relation to the compassionate release motions, purporting to be from Chaplain Jon Woods of USP McCreary. (T. Tr. 562; Gov't Ex. 203.) The letter stated that Woods submitted the letter as a reference and recommendation for Mr. Bowden and that Mr. Bowden "would be a great asset to society if given the opportunity, just as he has been throughout his incarceration." (Gov't Ex. 203.) Woods testified that he worked as staff chaplain at USP McCreary from 2006 until February of 2023. (T. Tr. 449.) Although he wrote a few character letters for inmates during this time, he did not write the one filed in relation to Mr. Bowden's compassionate release motion. (T. Tr. 451, 458.)

The FBI began an investigation into the anonymous letter to Stern and the chaplain letter. (T. Tr. 581, 636.) The investigation identified Mr. Bowden as the source of both letters and FBI Agent Timothy Bacha interviewed Mr. Bowden at USP McCreary on July 24, 2023. (T. Tr. 586.) When he was shown the anonymous letter, Mr. Bowden falsely stated "I didn't send that" and "I didn't type nothing." (T. Tr. 594; Gov't Ex 310D.) Mr. Bowden was also shown the chaplain letter and asked if that was the first time he had seen the letter. (T. Tr. 592; Gov't Ex. 310A.) He responded, "Yeah, right now" and "I don't know

5

nothing about it, though." (Gov't Ex. 310A.)

On November 17, 2023, an FBI agent obtained a buccal swab from Mr. Bowden. (T. Tr. 413.) Forensic examination determined that Mr. Bowden's DNA was on the envelope containing the anonymous letter and on the envelope containing the chaplain letter. (T. Tr. 501, 505.) Mr. Bowden's daughter, Glenda Rogers, testified that she mailed things for her father, including an envelope marked "ATTN Stern" and the envelope containing the chaplain letter. (T. Tr. 328, 344, 351.)

The grand jury issued a superseding indictment on August 15, 2024, charging Mr. Bowden with one count of mailing a threatening communication to Stern in violation of 18 U.S.C. § 876(c) (Count 1); one count of attempting to corruptly obstruct, influence, and impede an official proceeding based on the fraudulent chaplain letter in violation on 18 U.S.C. § 1512(c)(2) (Count 2); and one count of making false statements to the FBI in violation of 18 U.S.C. § 1001(a)(2) (Count 3). (R. 37.)

## III. Jury Trial and Guilty Plea.

At various times throughout the proceedings, Mr. Bowden represented himself with the assistance of standby counsel, including during pretrial proceedings and the jury trial. (6/11/24 Tr. at 5-23.) Jury trial commenced on September 23, 2024, and the government rested its case on September 25, 2024.

(R. 64, T. Tr. 661.) Mr. Bowden planned on testifying during the morning of September 26, 2024, but when everyone arrived in court, standby counsel said Mr. Bowden wished to plead guilty. (T. Tr. 718-19.) Mr. Bowden also requested to be represented by standby counsel and no longer wanted to proceed *pro se.* (T. Tr. 720.)

The district court conducted the change of plea hearing immediately. (T. Tr. 722.) Mr. Bowden pled guilty to all three counts of the superseding indictment without the benefit of a written plea agreement. (T. Tr. 718.) Defense counsel indicated the court could rely on the trial testimony to find a factual basis for the offenses and the government agreed. (T. Tr. 737-38.) Government counsel summarized the evidence and Mr. Bowden agreed to the factual basis for the offenses. (T. Tr. 739-42.) The court accepted Mr. Bowden's guilty plea. (T. Tr. 743.)

After the change of plea hearing, Mr. Bowden filed multiple *pro se* motions to withdraw his guilty plea, despite being represented by counsel. (R. 68, 79, 92, 95, 106.) At a hearing on one of the motions to withdraw his guilty plea, the district court allowed Mr. Bowden to represent himself. (10/10/24 Tr. at 2-3.) However, the court then questioned whether defense counsel was still representing Mr. Bowden and concluded that he was. (10/10/24 Tr. at 11-20.) Defense counsel moved to withdraw and the court appointed new counsel.

(10/10/24 Tr. at 24-25; 11/6/24 Tr. at 2.)  The district court ultimately denied all of the motions to withdraw his guilty plea.  (11/6/24 Tr. at 14; 6/12/25 Tr. at 14; App. 13.)

**IV.     Presentence Investigation Report.**

The United States Probation Officer prepared a presentence investigation report on January 6, 2025.  (R. 81.)  Using the 2024 version of the sentencing guidelines, the officer determined the offenses could not be grouped and determined the adjusted offense level separately for each count.  (R. 81, p. 11-12.)

For Count 1 – the offense of mailing a threatening communication – the officer determined the base offense level was 12 under § 2A6.1(a)(1).  (R. 81, p. 11.)  The officer assessed a six level enhancement under §§ 3A1.2(a)(1) and (2) based on Stern's status as a government official.  (R. 81, p. 12.)  The adjusted offense level for Count 1 was 18.  (R. 81, p. 12.)  For Count 2 – the obstruction of justice offense – the officer determined the base offense level was 14 under § 2J1.2(a).  (R. 81, p. 12.)  There were no enhancements for this offense and the adjusted offense level for Count 2 was 14.  (R. 81, p. 12.)  For Count 3 – the false statement offense – the officer also determined the base offense level was 14 under § 2J1.2(a).  (R. 81, p. 12.)  There were no enhancements related to this offense and the adjusted offense level for Count 3 was 14.  (R. 1, p. 12.)

Using the multiple count adjustment provisions, each of the three counts

was assigned one unit.  (R. 81, p. 13.)  Three units resulted in a three level enhancement under § 3D1.4 to the greatest adjusted offense level.  (R. 81, p. 13.)  The greatest adjusted offense level in this case was 18 and, therefore, the combined adjusted offense level was 21.  (R. 81, p. 13.)  After a two level reduction for acceptance of responsibility, the probation officer determined the total offense level was 19.  (R. 81, p. 13.)  The probation officer also determined Mr. Bowden had a total of 15 criminal history points which resulted in a criminal history category of VI.  (R. 81, p. 20.)  The applicable guidelines range calculated by the probation officer was 63 to 78 months.  (R. 81, p. 35.)

The officer also noted the statutory maximum sentences for each offense. (R. 81, p. 35.)  Count 1, a violation of 18 U.S.C. § 876(c), had a statutory maximum of 10 years in prison.  (R. 81, p. 35.)  Count 2, a violation of 18 U.S.C. § 1512(c)(2), had a statutory maximum of 20 years in prison.  (R. 81, p. 35.)  Count 3, a violation of 18 U.S.C. § 1001(a)(2), had a statutory maximum of five years in prison.  (R. 81, p. 35.)

The government filed a sentencing memorandum on January 23, 2025.  (R. 84.)  It argued Mr. Bowden should not receive a reduction for acceptance of responsibility because he pled guilty after the government presented its case-in-chief at trial and had filed several motions to withdraw his guilty plea.  (R. 84, p. 9-10.)  The government also argued that Mr. Bowden had minimized his conduct,

9

calling the letter to Stern "sex talk," and blamed another inmate for writing the letter.  (R. 84, p. 12.)  The government recommended a sentence of 87 months in prison, consecutive to Mr. Bowden's previous federal sentence.  (R. 84, p. 1.)

Defense counsel filed a sentencing memorandum on January 30, 2025.  (R. 85.)  Counsel indicated that the parties agreed three criminal history points were erroneously assessed, bringing Mr. Bowden's total number of criminal history points to 12.  (R. 85, p. 3.)  With this reduction, the parties agreed the criminal history category should be V rather than VI.  (R. 85, p. 3.)  Defense counsel argued he should receive a reduction for acceptance of responsibility because he pled guilty.  (R. 85, p. 3.)  Counsel requested a sentence of 36 months running concurrently with his previous federal case.  (R. 85, p. 4.)

On July 7, 2025, the government filed a supplemental sentencing memorandum.  (R. 107.)  The government detailed Mr. Bowden's lack of acceptance of responsibility since the filing of its first memorandum. (R. 107.) During that time, Mr. Bowden emailed a third party asking to find out information about Stern, filed multiple motions to withdraw his guilty plea, filed other frivolous motions, and had harassed the original prosecutor on the case. (R. 107, p. 1-2.)  The government indicated it was now requesting a sentence of 105 months, consecutive to the sentence imposed in the 2019 case.  (R. 107, p. 1.)

## V.    Sentencing.

The district court held a sentencing hearing on July 8, 2025. (R. 108.) At the beginning of the hearing, Mr. Bowden indicated he wanted to fire his appointed counsel and represent himself. (App. 2-6.) The court denied his request, finding his request was merely a delay tactic, disruptive, and untimely. (App. 10-12.) The court then asked whether Mr. Bowden had received the PSR and reviewed it with counsel. (App. 18.) Mr. Bowden said he had reviewed it but had not gone over it with his attorney and needed time to go over it. (App. 18.) Mr. Bowden said he needed more time because "it's a lot of stuff in there is lies." (App. 18.) The court denied his request, stating, "There's going to be an opportunity to – there already has been an opportunity to provide any corrections to the PSR in writing, and we also will discuss that during the hearing today, so I find that it's okay to proceed." (App. 18.)

The court then made findings on the guidelines calculations. (App. 19.) The court found the correct criminal history category was V. (App. 19; R. 112, p. 4.) The court asked the parties if there were any disputes about the guidelines. (App. 41.) The government stated the only dispute was with acceptance of responsibility. (App. 41.) Defense counsel said, "I believe that's correct." (App. 41.) The parties argued the objection to the acceptance reduction and defense counsel stated it should be applied because Mr. Bowden was cooperative with

11

probation and pled guilty. (App. 41.) The court found that Mr. Bowden had not accepted responsibility and removed the two level reduction. (App. 47; R. 112, p. 3.) The court then again asked if there were any guidelines disputes. (App. 47.) The government answered that the offense level was now 21 and no other disputes were noted by either party. (App. 47.) With this finding, the total offense level was 21 and the applicable guidelines range was 70 to 87 months. (App. 48.) The court asked if defense counsel agreed this was the correct guidelines calculation and defense counsel said it was. (App. 51.)

The parties argued in aggravation and mitigation and Mr. Bowden spoke on his own behalf. (App. 62-78, 84-99.) The district court imposed a total sentence of 87 months, running consecutively to Mr. Bowden's previous federal sentence. (App. 110.) When imposing the sentences, the court stated, "It is the judgment of the Court that you be committed to the custody of the Bureau of Prisons to be imprisoned for a total term of 87 months on Counts One, Two and Three of the indictment. . . . So it's consecutive to – the sentence in this case, the 87 months on Counts One, Two and Three of the . . . superseding indictment . . . is consecutive to the 19 CR 924 sentence." (App. 111.)

The district court entered the judgment in a criminal case on July 11, 2025. (App. 114.) The judgment reflected the district court's oral imposition of sentence, stating Mr. Bowden would "be imprisoned for a total term of: 87

months as to count 1s; 87 months as to count 2s; and 87 months as to count 3s, all such terms to run concurrently with each other; and the total term of 87 months shall run consecutively with defendant's sentence in USA v. Bowden, Case No. 19-cr-924 in the United States District Court for the Northern District of Illinois." (App. 115.)  Mr. Bowden filed a timely notice of appeal on July 21, 2025.  (R. 119.)

**SUMMARY OF ARGUMENT**

The district court miscalculated the guidelines range by using the wrong guidelines section for the base offense level associated with Count 3. The court used the base offense level in § 2J1.2(a) for Count 3 but § 2B1.1 is the appropriate guidelines section for a violation of § 1001(a)(2). There are certain circumstances where the conduct comprising the § 1001(a)(2) offense is more aptly covered by another guideline and a cross-reference is allowed. However, Mr. Bowden's offense does not meet the criteria for the cross-reference. The cross-reference requires that "the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two."

"Establishes an offense" means the count of conviction must establish the elements of the other offense. None of the possible offenses referencing § 2J1.2 were established by Mr. Bowden's conviction under § 1001(a)(2). Because the allegations of the indictment do not support application of § 2J1.2, the district court erred in applying the cross-reference provision under § 2B1.1(c)(3). This error was plain based on clear language of the sentencing guidelines and this Court's case law. Therefore, this Court must reverse and remand for resentencing.

In addition, this matter must be remanded based on the district court's imposition of a sentence on Count 3 above the statutory maximum sentence.

**ARGUMENT**

**I.** **The district court miscalculated the guidelines range by using the wrong guidelines section for the base offense level associated with Count 3.**

**A.** **Standard of Review.**

Ordinarily, this Court reviews the district court's application of the sentencing guidelines *de novo* and its factual findings for clear error. *United States v. Jumah,* 599 F.3d 799, 811 (7th Cir. 2010). When no objection to the challenged guidelines calculation is made in the district court, review is for plain error unless the issue has been waived. *Id.* Defense counsel did not object to the challenged guideline issue raised in this appeal and indicated at various times during the sentencing hearing that there were no challenges to the guidelines other than the reduction for acceptance of responsibility. However, Mr. Bowden indicated he disagreed with portions of the PSR and had not discussed the PSR with counsel. (App. 18.) The district court denied his request for more time to object, finding there had been prior opportunities to object. (App. 18.) Given the state of the record here, a finding of forfeiture of the issue is more appropriate than a finding of waiver.

"The lines between waiver and forfeiture are not always clear." *United States v. Robinson*, 964 F.3d 632, 640 (7th Cir. 2020). Waiver occurs when a party intentionally relinquishes a known right; forfeiture, in contrast, occurs as a result of a negligent failure timely to assert a right. *United States v. Hyatt,* 28 F.4th 776,

781 (7th Cir. 2022); *citing United States v. Olano*, 507 U.S. 725, 733 (1993). The primary concern is "whether a defendant chose, as a matter of strategy, not to present an argument." *United States v. Garcia*, 580 F.3d 528, 541 (7th Cir. 2009). For sentencing arguments, this Court will find waiver when the defendant objected to other parts of the PSR that do not concern the asserted error, stated on the record that he had no further objections, and had sound strategic reasons for failing to press the argument in the district court. *See United States v. Hathaway*, 882 F.3d 638, 641-42 (7th Cir. 2018).

Defense counsel did not challenge the base offense level used for Count 3. Counsel objected to the government's argument that Mr. Bowden should not receive an acceptance of responsibility reduction. (App. 41.) Counsel did not state there were no further objections specifically but did agree the district court's final calculation of the guidelines range was correct. (App. 51.) Therefore, only the third element of the waiver analysis – whether there were strategic reasons for failing to object – is at issue here.

To waive an argument for appeal, the "defendant must have had some strategic reasons for waiving the argument in the trial court." *United States v. Turner*, 47 F.4th 509, 526 (7th Cir. 2022). This Court will not find waiver where an ambiguous record exists and finding waiver would compel the conclusion that counsel had performed deficiently by failing to object. *United States v. Hernandez,*

44 F.4th 1053, 1060 (7th Cir. 2022), *citing United States v. Jaimes-Jaimes,* 406 F.3d 845, 848 (7th Cir. 2005). This Court has also found forfeiture, rather than waiver, "when the government cannot proffer a plausible strategic justification for a decision not to object." *United States v. Dridi,* 952 F.3d 893, 898 (7th Cir. 2020). Therefore, the government bears the burden of offering a strategic justification for defense counsel's failure to object.

In this case, there was no strategic reason for counsel's failure to object to the calculation of the base offense level for Count 3. It was a purely legal issue and would not have impacted the district court's determination of the acceptance of responsibility issue. In addition, a mere failure to object to part of a PSR is not enough to support a finding of waiver. *Hyatt,* 28 F.4th at 782; *citing United States v. Hammond,* 996 F.3d 374, 399 (7th Cir. 2021). "Even when a defendant repeatedly states that he has no objections to the PSR, those statements are not dispositive." *Hyatt,* 28 F.4th at 782 (cleaned up); *citing Jaimes-Jaimes,* 406 F.3d at 848. This case presents a similar situation as found in *Hyatt.* There was no plausible reason to not object to the base offense level for Count 3. In addition, the record is somewhat ambiguous, as in *Hyatt,* because Mr. Bowden stated there were multiple mistakes in the PSR but the court and defense counsel ignored his statements. Defense counsel agreed with the court's final calculation but never specifically said there were no other objections.

"The waiver principle is construed liberally in favor of the defendant." *Hammond*, 996 F.3d at 399. Based on the lack of strategic reason to object, plain error review is appropriate here.  Plain error review requires this Court to find: (1) whether there was error; (2) whether it was plain; (3) whether it affected Mr. Bowden's substantial rights; and (4) whether it seriously impugned the fairness, integrity, or public reputation of the judicial proceedings.  *United States v. Anderson*, 604 F.3d 997, 1002 (7th Cir. 2010).

### B.     Mr. Bowden's conviction under § 1001(a)(2).

Mr. Bowden was charged in Count 3 with a violation of 18 U.S.C. § 1001(a)(2).  (R. 37.)  An individual commits the crime of making a false statement when "in any matter within the jurisdiction of executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation." 18 U.S.C. § 1001(a)(2).  The superseding indictment in this case alleged the following for Count 3:

> The SPECIAL JUNE 2024 GRAND JURY further charges:
> 1.     Paragraph 1 of Count Two is incorporated here.
> 2.     At times material to Count Three of this indictment:
>     a.     Probation Officer A, who worked as a probation officer at the United States Probation Office in Chicago, conducted the presentence investigation of defendant GLENN BOWDEN in connection with his 2019 Criminal Case.
>     b.     On or about May 19, 2023, the United States Postal Service delivered an anonymous typewritten letter in an envelope addressed to Probation Officer A at the United States Probation

Office in Chicago, Illinois ("the Anonymous Letter").

    c.    The Federal Bureau of Investigation was investigating possible violations of criminal law in connection with the mailing of the Anonymous Letter to Probation Officer A in Chicago and the filing of the Chaplain Letter in the 2019 Criminal Case in Chicago.

    d.    The following matters, among others, were material to the FBI's investigations:

        i.    whether defendant authored, caused to be authored, typed, sent, caused to be sent, or otherwise knew about the Anonymous Letter; and

        ii.    whether defendant authored, caused to be authored, typed, sent, caused to be sent, or otherwise knew about the Chaplain Letter.

3.    On or about July 24, 2023, in the Northern District of Illinois, Eastern Division, and elsewhere,

GLENN BOWDEN,

defendant herein, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency within the executive branch of the Government of the United States, when in substance he stated that:

    a.    he did not type or send the Anonymous Letter to Probation Officer A; and

    b.    he knew nothing about the Chaplain Letter and did not know who wrote it;

    In violation of Title 18, United States Code, Section 1001(a)(2).

(R. 37, p. 4-5.)  Mr. Bowden pled guilty to this offense as well as the offenses charged in Counts 1 and 2.

### C.    The district court erroneously used § 2J1.2(a) to calculate the base offense level.

The probation officer did not group any of the three offenses of conviction in this case so each count carried its own separate guidelines calculation.  *See* U.S.S.G. § 3D1.2(d).  Mr. Bowden does not dispute the calculations for Counts 1

and 2.  For Count 3, the probation officer determined the base offense level was 14 pursuant to § 2J1.2(a).  (R. 81, p. 12.)  There were no enhancements to this level so the adjusted offense level for Count 3 was 14.  (R. 81, p. 12.)  The provisions of the multiple count adjustment guideline added one unit for each of the three counts and the probation officer imposed a three level enhancement to the highest offense level of 18 under § 3D1.4.  (R. 81, p. 13.)  The district court adopted these calculations and determined the total offense level was 21 and, with a criminal history category of V, the applicable guidelines range was 70 to 87 months.

There is no justification contained in the PSR for using the base offense level in § 2J1.2(a) for Count 3.  When determining the guidelines section for every federal offense, the first step is consulting Appendix A of the sentencing guidelines manual.  U.S.S.G. §§ 1B1.1(a)(1), 1B1.2(a).  Appendix A states that 18 U.S.C. § 1001 uses either 2B1.1 or "2J1.2 (when the statutory maximum term of eight years' imprisonment applies because the matter relates to international terrorism or domestic terrorism, or to sex offenses under 18 U.S.C. § 1591 or chapters 109A, 109B, 110, or 117 of title 18, United States Code)."  U.S.S.G., App. A.  The statutory maximum term of imprisonment for Mr. Bowden's conviction under § 1001(a)(2) is five years because it does not relate to terrorism.  *See* 18 U.S.C. § 1001.  In addition, Mr. Bowden's conviction is not a sex offense under §

20

1591 and is not listed in any of the specified chapters of Title 18. Section 1001 is in Chapter 47 of Title 18 and excluded from the § 2J1.2 analysis in Appendix A. Therefore, § 2J1.2 is not the appropriate starting point for the guidelines calculations for Mr. Bowden's § 1001(a)(2) offense.

Because Mr. Bowden's offense does not meet the criteria for direct application for § 2J1.2, the probation officer's guidelines calculations should have started with § 2B1.1. Under § 2B1.1(a), the base offense level depends again on the statutory maximum sentence for the offense of conviction. U.S.S.G. § 2B1.1(a). In this case, the base offense level for Mr. Bowden's offense would be 6. U.S.S.G. § 2B1.1(a)(2). This Court has remarked that a conviction under § 1001(a) ordinarily yields a base offense level of 6 under § 2B1.1(a)(2). *United States v. Carpenter,* 576 Fed. Appx. 610, 613 (7th Cir. 2014), *citing United States v. Garcia,* 590 F.3d 308, 312 (5th Cir. 2009). There are certain circumstances, however, where the conduct comprising the § 1001(a)(2) offense is more aptly covered by another guideline. *See Garcia,* 590 F.3d at 313.

To account for this, § 2B1.1(c) contains cross-references for certain offenses. The first two cross-references do not apply in this case because the offense did not involve firearms, destructive devices, controlled substances, or arson. *See* U.S.S.G. § 2B1.1(c)(1) and (c)(2). The third cross-reference is often used in § 1001 cases and likely was the basis for the probation officer's use of § 2J1.2 in this case:

21

(3) If (A) neither subparagraph (1) nor (2) of this subsection applies; (B) the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally (e.g., 18 U.S.C. § 1001, § 1341, § 1342, or § 1343); and (C) the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct), apply that other guideline.

U.S.S.G. § 2B1.1(b)(3). To reach § 2J1.2 for a § 1001 conviction, the district court can use this cross-reference but must meet the requirements thereof. *See United States v. Bah,* 439 F.3d 423, 427 (8th Cir. 2006). The issue here is whether "the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two." U.S.S.G. § 2B1.1(b)(3)(C).

"Establishes an offense" means the count of conviction must establish the elements of the other offense. This Court considered the issue in a similar case where the government conceded the evidence did not establish the defendant actually committed the offense used for the cross-reference. *United States v. Verdone,* 121 Fed. Appx. 162, 163 (7th Cir. 2005). Although *Verdone* does not significantly analyze the issue, it cites a Second Circuit case specifically requiring the elements of the other offense be proven. *Id., citing United States v. Genao,* 343 F.3d 578, 583 (2d Cir. 2003). *Genao* specifically states, "[T]he plain language of § 2B1.3(c)(3) indicates that § 2B1.3(c)(3) is appliable only if the conduct alleged in the count of the indictment of which the defendant is convicted establishes the elements of another offense." *Genao,* 343 F.3d at 583.

22

*Genao* is in line with the plain reading of the guidelines and every circuit court to consider the issue. Across the board, the circuits have held that the cross-reference under § 2B1.1(b)(3) is only applicable if the conduct alleged in the indictment for that count establishes the elements of another offense. *United States v. Nucera,* 67 F.4th 146, 174 (3d Cir. 2023); *Garcia,* 590 F.3d at 315; *Bah,* 439 F.3d at 427 (8th Cir. 2006); *United States v. Kim,* 95 Fed. Appx. 857, 861-62 (9th Cir. 2004); *Genao,* 343 F.3d at 583. This requirement is supported by the amendment to the guidelines in which eliminated § 2F1.1 and replaced it with § 2B1.1 and narrowed the applicability of the cross reference. *Bah,* 439 F.3d at 427 n. 3; *Genao,* 343 F.3d at 583-84.

The probation officer did not explain how the cross-reference to § 2J1.2 was applicable here and how Count 3 established an offense that was "specifically covered" by Mr. Bowden's conduct as alleged in the indictment. *See Garcia,* 590 F.3d at 314. Appendix A of the guidelines lists 27 statutes that use § 2J1.2 to calculate the base offense level for a violation of those statutes. Those are the statutes that establish offenses that are specifically covered by § 2J1.2. The only two statutes could apply here and use § 2J1.2 are 18 U.S.C. § 1505 and 18 U.S.C. § 1512(c)(2), both obstruction of justice statutes.[2] Section 1505 criminalizes

---

[2] For the sake of thoroughness, the remaining statutes that use § 2J1.2 are: 18 U.S.C. § 245(b) (civil rights violations); 18 U.S.C. § 505 (forgery of court signatures); 18 U.S.C. § 551 (customs offenses); 18 U.S.C. § 665(c) (theft/embezzlement from employment and

"corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States . . . ." 18 U.S.C. § 1505. Section 1512(c)(2) criminalizes, "corruptly . . . otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so." 18 U.S.C. § 1512(c)(2).

The facts alleged in Count 3 of the indictment do not establish the elements of either one of these offenses. Both § 1505 and § 1512(c)(2) require that the defendant act "corruptly" but § 1001 has no such requirement. *See United States v. Griego*, 837 F.3d 520, 522-23 (5th Cir. 2016). Section 1001 only requires that the

---

training funds); 18 U.S.C. § 1001 (only when involves terrorism, sex offenses, and certain chapters of Title 18); 18 U.S.C. § 1033 (crimes involving insurance); 18 U.S.C. § 1204 (international parental kidnapping); 18 U.S.C. § 1503 (influencing/injuring officer or juror, grand jury); 18 U.S.C. § 1506 (theft or alteration of records or process); 18 U.S.C. § 1507 (picketing or parading with intent to interfere with administration of justice); 18 U.S.C. § 1508 (recording or listening to grand or petit jury deliberations); 18 U.S.C. § 1509 (obstruction of court orders); 18 U.S.C. § 1510 (obstruction of criminal investigations by bribery); 18 U.S.C. § 1511 (obstruction of state or local law enforcement, conspiracy, gambling); 18 U.S.C. § 1512(a) (witness tampering); 18 U.S.C. § 1512(b) (witness tampering); 18 U.S.C. § 1512(c)(1) (record tampering); 18 U.S.C. § 1512(d) (harassing witnesses); 18 U.S.C. § 1513 (witness retaliation); 18 U.S.C. § 1514(c) (violating protective order); 18 U.S.C. § 1516 (obstruction of federal audit); 18 U.S.C. § 1517 (obstruction of financial institute examination); 18 U.S.C. § 1518 (obstruction of health care investigations); 18 U.S.C. § 1519 (destruction federal investigation records); (18 U.S.C. § 2232 (destruction of property); and 26 U.S.C. § 7212(a) (interference with administration of internal revenue laws). For obvious reasons, none of these statutes apply to the facts of this case.

false statement be made "knowingly and willfully."  18 U.S.C. § 1001(a)(2).  The more generalized *mens rea* in § 1001 is not sufficient to prove the more specific *mens rea* in § 1505 or § 1512(c)(2).  *See Griego,* 837 F.3d at 523, *citing Kim,* 95 Fed. Appx. at 862.  The indictment did not allege Mr. Bowden acted corruptly when he lied to the FBI Agent about the two letters.

Because the allegations of the indictment do not support application of § 2J1.2, the district court erred in applying the cross-reference provision under § 2B1.1(c)(3).  This error was plain based on clear language of the sentencing guidelines and this Court's case law.  There is no question that the probation officer used the wrong guideline to calculate the base offense level.  *See Jaimes-Jaimes,* 406 F.3d at 850.

Furthermore, the error affected Mr. Bowden's substantial rights.  Because the cross-reference in § 2B1.1(c)(3) is not applicable here, the district court miscalculated the guidelines range.  If the correct base offense level for Count 3 had been used, the multiple count adjustment calculation would be different.  Counts 1 and 2 would each receive one unit under § 3D1.4(a).  However, Count 3 would not receive any units because the base offense level was 12 levels less serious that the highest base offense level.  *See* U.S.S.G. § 3D1.4(c).  As a result, the enhancement under § 3D1.4 would be two, rather than three, resulting in a total offense level of 20, rather than 21.  This reduction in total offense level

means that Mr. Bowden's applicable guidelines range should have been 63 to 78 months. His sentence of 87 months was therefore above the correctly calculated guidelines range.

The error also seriously impugned the fairness, integrity, or public reputation of the judicial proceedings. The error impacted the fairness of the proceedings because Mr. Bowden received a higher sentence based on an error that defense counsel, the Assistant United States Attorney, the probation officer, and the district court judge failed to notice. *See Jaimes-Jaimes*, 406 F.3d at 851. It would be "unjust to place the entire burden for these oversights on [Mr. Bowden] by permitting him to serve an excessive prison sentence." *Id.* Therefore, this Court must reverse and remand for resentencing.

**II.     This matter must be remanded based on the district court's imposition of a sentence on Count 3 above the statutory maximum sentence.**

**A.     Standard of Review.**

At sentencing, Mr. Bowden did not object to the district court's imposition of an 87 month sentence on Count 3, despite the fact that the statutory maximum sentence for Count 3 is five years. As discussed above, waiver occurs when a criminal defendant intentionally relinquishes a known right but forfeiture is failure to timely assert a right. *United States v. Clark*, 535 F.3d 571, 577 (7th Cir. 2008). This issue should be considered forfeited, rather than waived, because there would be no strategic reason not to seek a sentence within the statutory

range. *United States v. Gibson*, 356 F.3d 761, 765 (7th Cir. 2004) (reviewing an illegal sentence under plain error). Thus, this Court reviews this issue for plain error.

**B.      The sentence for Count 3 was above the statutory maximum.**

The statutory maximum sentence for Mr. Bowden's offense under § 1001(a)(2) was five years.  The sentence imposed, both orally and in the written judgment, for that offense was 87 months.  This was clearly an illegal sentence because it exceeded the statutory maximum sentence.  Imposition of an illegal sentence is plain error and the entry of an illegal sentence is a serious error routinely corrected on plain error review.  *United States v. Pawlinski*, 374 F.3d 536, 540-41 (7th Cir. 2004).  An illegal sentence "compels a remand to the district court" for correction.  *United States v. Moody*, 770 F.3d 577, 580 (7th Cir. 2014).  Therefore, this matter must be remanded for correction of the judgment.

Counsel notes there are mechanisms to correct erroneous sentences without a remand from this Court.  Neither one applies here.

Under Federal Rule of Criminal Procedure 35(a), "Within 14 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error."  Fed. R. Crim. P. 35(a).  Unfortunately, the error regarding the sentence imposed on Count 3 was not noticed by any party within 14 days of sentencing.  Therefore, Rule 35(a) does not apply.

Federal Rule of Criminal Procedure 36 allows the district court to "at any time correct a clerical error in a judgment, order, or other part of the record, or correct an error in the record arising from oversight or omission." Fed. R. Crim. P. 36. However, the error here was not merely clerical in nature. An inconsistency between the oral pronouncement and the written sentence is clerical error within the scope of Rule 36. *United States v. Lee,* 77 F.4th 565, 583 (7th Cir. 2023). But Rule 36 is not intended to fix errors made by the court itself. *United States v. McClain,* 16 F.4th 487, 492 (7th Cir. 2021), *quoting United States v. Daddino,* 5 F.3d 262, 264 (7th Cir. 1993). The court's oral pronouncement was 87 months on all three counts, which was an error made by the court itself. This was not a mere clerical error. Therefore, Rule 36 does not apply here.

It is rarely, if ever, arguable that an illegal sentence does not constitute plain error. *Pawlinski*, 374 F.3d at 540-41. By its very nature, there is an error, it is plain, it affects the defendant's substantial rights, and it impugns the reputation of the judicial proceedings. "It is a miscarriage of justice to give a person an illegal sentence that increases his punishment, just as it is to convict an innocent person." *United States v. Paladino*, 401 F.3d 471, 483 (7th Cir. 2005). By allowing an illegal sentence "to stand would impugn the fairness, integrity, and public reputation of the judicial proceedings." *Gibson*, 356 F.3d at 767. Thus, the district court committed plain error by sentencing Mr. Bowden beyond the statutory

maximum for Count 3.  This matter must be remanded for correction of the

judgment.

## CONCLUSION

Defendant-Appellant Glenn Bowden respectfully requests this Court

reverse and remand this matter for resentencing.

Respectfully submitted,
THOMAS W. PATTON
Federal Public Defender

s/ Johanna M. Christiansen
JOHANNA M. CHRISTIANSEN
Assistant Federal Public Defender

Attorneys for Defendant-Appellant,
GLENN BOWDEN

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(B)**

The undersigned certifies that this brief complies with the volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32 in that it contains 6,720 words and 586 lines of text as shown by Microsoft Word 2016 used in preparing this brief.

<u>s/  Johanna M. Christiansen</u>
JOHANNA M. CHRISTIANSEN

Dated:  March 12, 2026

No. 25-2297

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

GLENN BOWDEN,
Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:24-cr-00143
The Honorable Judge Martha M. Pacold

REQUIRED SHORT APPENDIX OF
DEFENDANT-APPELLANT, GLENN BOWDEN

FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF ILLINOIS
401 Main Street, Suite 1500
Peoria, Illinois 61602
Telephone:  (309) 671-7891
Fax:          (309) 671-7898
Email: Johanna_Christiansen@fd.org

THOMAS W. PATTON
Federal Public Defender

JOHANNA M. CHRISTIANSEN
Assistant Federal Public Defender


Attorneys for Defendant-Appellant,
GLENN BOWDEN

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30**

The undersigned counsel for Defendant-Appellant, hereby states that all of

the materials required by Circuit Rule 30(a) and 30(b) are included in the

Appendix to this brief.

s/ Johanna M. Christiansen
JOHANNA M. CHRISTIANSEN
Assistant Federal Public Defender

Date: March 12, 2026

# APPENDIX TABLE OF CONTENTS

Certification .................................................................................................................ii

Sentencing Hearing Transcript .................................................................................. 1

Judgment in a Criminal Case ................................................................................ 114

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,           )  Case No. 24 CR 143
                                    )
           v.                       )
                                    )
GLENN BOWDEN,                       )  Chicago, Illinois
                                    )  July 8, 2025
                 Defendant.         )  10:14 a.m.

TRANSCRIPT OF PROCEEDINGS - SENTENCING
BEFORE THE HONORABLE MARTHA M. PACOLD

APPEARANCES:


For the Government:     MR. MORRIS O. PASQUAL
                        ACTING UNITED STATES ATTORNEY
                        BY:  MS. MAUREEN E. MERIN
                        219 South Dearborn Street
                        Suite 500
                        Chicago, IL 60604

For the Defendant:      BEZNER LAW OFFICE
                        BY:  MS. HALLIE M. BEZNER
                        121 N. Marion Street, Suite 200
                        Oak Park, IL 60302







Court Reporter:         KATHLEEN M. FENNELL, CSR, RMR, FCRR
                        Official Court Reporter
                        219 South Dearborn Street, Room 2328A
                        Chicago, Illinois  60604
                        Telephone:  (312) 435-5569
                        Kathleen_Fennell@ilnd.uscourts.gov

                        *   *   *   *   *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; defendant present:)

(Call to order.)

THE CLERK:  24 CR 143, United States v. Glenn Bowden.

Counsel you can state your names for the record. Everyone else can be seated.

MS. MERIN:  Good morning, Your Honor.  Maureen Merin on behalf of the United States.

MS. BEZNER:  Good morning again, Your Honor.  Hallie Bezner on behalf of Mr. Bowden, who is approaching now in custody of the marshals.

PROBATION OFFICER:  Good morning, Judge, S.B., U.S. Probation.

THE COURT:  Good morning.

THE DEFENDANT:  Good morning.

THE COURT:  Good morning.

Would you like to have a seat at the tables?

MS. BEZNER:  If that's all right with the Court.

THE COURT:  Okay.

MS. MERIN:  That's fine, Your Honor.

THE COURT:  All right.

Okay.  We are here for sentencing.  Is the government ready to proceed?

MS. MERIN:  We are, Your Honor.

THE COURT:  And is the defendant ready to proceed?

THE DEFENDANT:  No.  Your Honor, I have filed a motion

to -- to fire this attorney though. I don't want her to represent me.

THE COURT: Okay. I did not see that motion on the docket.

THE DEFENDANT: It's on the docket. I filed it.

THE COURT: I did see a new motion that was -- or appears to have been postmarked June 27th, 2025. Today is July 8th, and that new motion is at Docket 106. It's a motion to withdraw guilty plea, motion for reconsideration.

There's a response to -- or there's a government sentencing supplement at Docket 107, so those are the most recent filings. They're from -- I guess the motion to withdraw the guilty plea was -- it made it on the docket on -- or yesterday. It was entered on July 7th, but it also listed as having been received by mail in the clerk's office on July 1st.

So it sounds like it was postmarked, again, June 27th, received in the clerk's office by mail July 1st, and then entered on the docket yesterday, July 7th. And then the government's sentencing supplement, Docket 107, was filed yesterday, July 7th. But I do not see a motion to -- I don't see any other motions.

THE DEFENDANT: It's on there, and then I have a problem with the mailroom. What happened, though, the clerk Burton was sending the mail back because he was saying that it wasn't -- it didn't have a address on it. It had a return

address to 219, and they were sending it back because it didn't have the address to 71 West Van Buren, and they had a problem with that. So the individual who run the mailroom in MCC had sent it back twice, and he stated that he would give me a document stating that they done have this mail sitting down there for some months, just sitting there in the mailroom because he didn't know who the mail supposed to have went to.

And I was explaining to him though my name was on the mail, but I was having this problem, and I was having a problem prior to this here. Now, I was explaining to you that the problem I was having, I wasn't getting my mail out, but I was getting -- I was sending my mail out, but 219 wasn't receiving my mail because I was attacked -- a few issues that had transpired, like I was asking for reconsideration again on the -- on the withdraw of the guilty plea because I felt like I took it in vain.

And then I had this research on the standby counsel. He had all the time in the world to explain to me the position on it, though he was telling me to take a plea and I was telling him I really didn't want to take no plea, and he say that it's not a blind plea. But then I find out that it was a blind plea. I didn't even want to take a declaration plea. I wanted to withdraw.

I didn't want to take the plea, but when you had changed your mind about allowing my evidence to come into play,

meaning that I was requesting for you to allow me to put my -- my -- or, for a minute, let me see -- I was asking you to put my exhibits in and the exhibits that I wanted to put in at that time was that I wanted to attack the special agents' investigation, the interview that I had with them when they had allowed me to not know and I wasn't under the knowledge that they was recording me with the recording inside the envelope.

But then when I researched the protocol, the protocol say they would have to let me know. I did it voluntarily. I could have got up and walked out, but I didn't because I wanted to straighten it out. Then I got charged for giving false information to the special agents when they was lying they self. Both of them was lying, because they had me under the impression it was just going to be me talking about the compassionate relief letter that was allegedly anonymous that was wrote and the letter that was wrote to Danielle Steel, and all the time, though, they was trying to bait me in so they can give me another charge though for anonymous letter though.

Then they had knew -- when they went to do the investigation with Anthony Fleming, then he told them that he had typed the letter up. But then they still didn't acknowledge that. They still saying, like, okay, that's anonymous. And then Corey Rubenstein, he was up with it, too, because he was trying to sabotage me on my compassionate relief and everything else I was trying to accomplish. He was having

a problem with me, and I was just trying to vindicate myself because I'm saying that I didn't want to go to jail because I'm going to jail 'cause the -- the probation officer who allegedly did my PSI, he got inside my PSI. He saying that I had animosity to her. He act like he a psychic or something, like he knew, and me and him just talked about a few issues though. We didn't never go into the specifics because he just talked to me briefly, and everything else that he obtained, he obtained from the original PSI. He didn't never obtain all the information that he gathered and put inside the PSI for me. That's old information.

And so they just want to do their own thing, the prosecutors, the PSI man, and the special agents though. He said, like, he could do what he want to do, and he can't do what he want to do because it's a protocol for everything. It's a protocol for me. It's a protocol for you. It's a protocol for the attorney. It's a protocol for the prosecutor, and it's a protocol for the special agents though, and I got newly discovered evidence right here.

THE COURT: Okay. I -- so, first of all, to the extent that you're requesting any change in your representation, so requesting to represent yourself or requesting -- well, it's not clear to me what you're requesting with respect --

THE DEFENDANT: I want to represent myself, first of

all.  And then, Your Honor, by you being -- I want to represent myself.

And, Your Honor, by you being a woman with an extensive resumé, Your Honor, you know about certain things though, Your Honor.  I'm talking about your clerkship, I'm talking about precedes you not, and -- and you seen a lot of flaws in there because when you took the time to go back to the back and took a break and you supposed to have been having me back there with you and with the attorney, but you didn't.  So that was an *ex parte* when you didn't have me back there.

And then another time when you allowed me to say that -- I mean, when you allowed me to subpoena the prosecutor, then five minutes later after you thought about it, y'all went back there and talked, whatever, how it happened, you came back and say you not going to allow it.  But you allow them to sign it and note it and everything.

Then you turned around and told me that you was going to allow me to have the recordings that the special agents and them had recorded within the USP McCreary.  Then you say that I couldn't use it though, and -- but you said you be willing to play the whole recording so, and then you changed your mind again.

So now you made me feel some type of way, like, if I didn't cop out, that you was going to get down on me, period. You was going to get down on me.  So I felt like I was in a

position that I had to do something because you was swaying to they side and wouldn't allow me to present myself -- my -- my arguments, and you didn't allow me to have an opening statement though. So I felt like you was going to go with everything they said. Then everything I was trying to do, you was blocking it, so I felt like, hey, I didn't have a winning situation.

And not only that, I'm not trying to go to jail. I'm not trying to go back to the penitentiary because none of y'all ever been in the penitentiary and know how a penitentiary yields and feels, with killings and everything else. The officers whoop you. The way they lock you down, and I don't want no more of that. I'm tired of jail. I'm tired of being locked up.

And I was going to take that case because every time I went to court and for case when I lost, though, the judge gave me extensive amount of time. So I say look here, sometime I got to bite the bullet, and I was willing to bite this bullet, but I got evidence stating that I didn't even write the letter. I got evidence also saying that the 876 that Corey allegedly wrote me up before he superseded me, it's not even -- it's not even a threat in the body of the letter though. But I'm being charged as though. And then it's like you allowing him to do what they want to do when you is arbitrating and you know all the laws, you know not just all the laws, but you know the

proceedings and you know the law.

Now, a lot of lawyers though just know the proceeding of the law, but you know the law though. It's different. And I feel like -- I mean, y'all just -- just running -- you were just allowing them to run over me and just have their way with me when I got evidence stating that I didn't do what they say I did.

But I couldn't vindicate myself because I'm being blocked. Everywhere I'm trying to go, I'm being blocked though. You denying everything I'm trying to bring across to you so you could see. I don't want to go to jail. I'm tired of jail.

My family need me. I support my whole family, my entire family though. So Corey didn't say nothing about the $2.5 million they took from me when they robbed me, the police. I got the documents right here. They didn't say nothing about that.

Judge Leinenweber, he didn't say nothing about it. Only thing he stated where you get the money from? And so I didn't say nothing about that, but they did bring up a letter because the special prosecutor -- I mean the special agents, they title say special agent though, but is they really a special agent? Then he tell me from protocol -- I mean, from his own -- own words though, it's on the record, he's telling me he could do what he want to do.

He can't do what he want to do. He employed by the government. He not on his own. FBI don't belong to him. He just a worker. Both of them are. But they acting like as though they run the FBI.

That's not the protocol to tape somebody without their consent or their permission, and he was doing it -- they was doing it being sneaky. I could have just walked out if I would have asked where he say, hey, we recording you though. I didn't lie. I just told them everything that happened though. He got it -- he even got the same thing that I stated with the person named Anthony Flemings. They didn't never bring none of that up though. Corey was hiding that though.

THE COURT: Okay. So I -- to the extent that you're requesting to represent yourself at this stage, I am denying that request.

So I -- it's, first of all, it's basically just switching back and forth midstream too many times, how the representation is going. At times during the case, including through trial, you represented yourself. Then for purposes of the plea, Mr. Levine, who had been standby counsel at trial, you asked that he represent you for the plea, and he did so.

Then you changed counsel. Now Ms. Bezner is representing you for sentencing, and now this is not the first time we've attempted to hold the sentencing. I, you know, previously tried to hold it in May, and it was rescheduled to

today to allow you to provide more materials to Ms. Bezner. And now that the morning of the rescheduled sentencing, you're requesting to represent yourself, and so that -- that switching back and forth is an alternating back and forth on your position on counsel, whether to have counsel, whether to represent yourself. That at this point I view as it's delaying.

THE DEFENDANT: No, it ain't delaying. It's all right -- excuse me -- it's all right for you to have continuances though, Your Honor. You the one that gave me the continuance in May. I didn't request that. And you gave me the same continuance you gave me the continuance in February, too, as well though. I didn't request that, but every time I want to -- to get a continuance or I want a continuance to vindicate myself or I want to give you some information on what was going on, though, is you denied though.

I'm just being denied all the way around the table though. For everything though, you just deny. You say one thing out your mouth saying, well, you going to let this happen, and you going to allow me to do this, present this and present that, but you never do. You come back and you deny it with no explanation.

You don't give me no explanation, and then you allow Corey to put in when he had a certain date to put in for the jurisdiction, and he put it in court a month later. I filed a

motion for default judgment there. Never heard it though. It just all of a sudden, it just disappeared there. A lot of the motions I put in this court just disappear, just out the blue though. Just disappear though.

THE COURT: Okay.

THE DEFENDANT: And then they give me who they want to give me when they want to give me and how they want to give it to me though. I don't have to take a attorney that I don't want. I got that right.

THE COURT: So, in general, there is a right to -- of course, there's a right to counsel at this stage and every other stage of the proceeding. There is also a right to represent yourself if you choose.

When counsel is appointed, there is not a right to choose your appointed counsel. And so here, you can't, you know, discharge appointed counsel in order to get a new appointed counsel. You also -- it also turns on where we are in the proceedings.

So we are now at a late stage in the case. We're at the sentencing. It has been continued. And so at this point, I -- any request to self-represent, I would view as both -- at this point, it's just disruptive, and it's also untimely because it is the morning of sentencing after I already delayed the sentencing as I explained before.

And so it's -- it is discretionary. When the request

to self-represent is untimely, it's a discretionary determination whether to allow self-representation, and that's under *United States v. Seale*, 461 F.2d 345, 360 (7th Cir. 1972). That case says: When requests to discharge counsel and proceed pro se are voiced in the middle of the trial, considerable weight is accorded the trial judge's balancing of the interests involved. The trial judge must make its determination on the basis of the facts and circumstances of this case. The question is whether the prejudice to the legitimate interests of the defendant overbalances the potential disruption of the proceedings already in progress.

And here we're, of course, well after the trial and plea. We are at a continued sentencing hearing. And at this point, the disruption of the proceedings outweighs the legitimate interests of the defendant in, you know, invoking *Faretta*.

So we are going to proceed.

There is -- before we turn to the sentencing, there is that new motion to withdraw the plea, which is -- and motion for reconsideration, which was filed pro se. I mentioned that filing earlier. And it is at Docket 106.

I -- so I'm going to deny this for the -- I previously denied at least one motion to withdraw the guilty plea, and so I'm going to deny this for the same reasons I did before, as well as that this is a motion filed pro se while Mr. Bowden is

represented by counsel, and so it's a form of hybrid representation.

So it's denied for all those reasons.

THE DEFENDANT: Hey, but I -- but, Your Honor, but I -- I -- I filed a motion and say that I want to withdraw my counsel and you never acknowledged it though. You never said it was on the docket, but I did this here because I wanted to file my own pro se motions though. I want to litigate myself though.

But you don't allow me to do that though because evidently, hey, you want to proceed, but you don't want me to vindicate myself though, and I want to vindicate myself because I feel like I been railroaded though --

THE COURT: Okay.

THE DEFENDANT: -- with you, too.

THE COURT: So I don't see that motion on the docket.

THE DEFENDANT: It's on the docket, Your Honor.

THE COURT: Okay. Whether it's on the docket or whether perhaps it's still in the mail and has not made it onto the docket, all the same reasons I just gave, that that motion is untimely, and as a discretionary matter, I find that it would be too much of a disruption to the proceedings at this stage for you to begin representing yourself again.

So it's denied whether it is --

THE DEFENDANT: I object.

THE COURT: -- it's filed or not.

THE DEFENDANT: It's not -- I object because, first of all, I was explaining to you what was the procedures over there in the Metropolitan Correction, and he was saying that they was having a problem with the mail, and he said if I need him to give you some kind of documentation, that he would do it because they did it they self because when you put the mail in the officer's hand and stuff like that, according to the statute, it's saying that it's been filed. And, you know, that's a statute. It's not me.

THE COURT: Okay. So whether it's been filed or not, I have heard that motion because you've explained it here in court today, and I --

THE DEFENDANT: And I --

THE COURT: -- I'm denying it.

THE DEFENDANT: -- I appeal that though to the Seventh Circuit, though, Court of Appeals though, on that -- on that when you said you denied it. I filed it. It's on -- it should be on the docket, too. When you denied, I filed appeal on.

THE COURT: Okay. So let's proceed to the sentencing. So -- and --

THE DEFENDANT: And I didn't request a blind plea neither though, Your Honor. I didn't say I was accepting a blind plea. You never did bring that to my attention. I would have never accept no blind plea.

THE COURT: There is Dockets 92 and 95, those are prior motions to withdraw the guilty plea, and I denied those on June 12th. It's reflected at Docket 97, as well as would be reflected in the transcript of that or on the record of that hearing on June 12th.

And so it's those reasons that also support the motion -- or the denial of the motion to withdraw the guilty plea that's at Docket 106.

Okay. So now going to the sentencing. So first let me just describe the procedure, Mr. Bowden, so I'm going to walk through the steps that I'm going to go through before I decide the sentence that I will impose.

I'll first make sure that I have everything that I'm supposed to have.

We're going to address any issues with the Presentence Investigation Report.

Then I'll calculate the Sentencing Guidelines, and we will review the proposed conditions of supervised release.

Then ordinarily we would turn, if there were any restitution or forfeiture at issue, to those issues. They're not at issue here.

So next I will hear from anyone other than the lawyers and you.

Then I'll ask your attorney to speak on your behalf.

Then I'll ask the government to speak.

And then, finally, I'll give you the opportunity to say anything you want to say to me.

Once I've heard from everyone, I'll explain how I view this case and how I weigh the various considerations that I have to take into account, and then I will announce the sentence.

Going through all those steps takes some time. If at any time you want to speak privately with your attorney, please let me know, and we'll pause and give you that opportunity.

I'm going to place you under oath to tell the truth because I want to ask you some questions, which are primarily to make sure that you understand the process and are ready to proceed.

If I could ask, please, that Mr. Bowden be placed under oath.

THE CLERK: Can you stand and raise your right hand.

THE DEFENDANT: I don't swear.

THE CLERK: You can affirm.

THE DEFENDANT: I don't swear.

THE CLERK: I'm asking you to affirm.

THE DEFENDANT: I don't do that.

THE COURT: Do you -- you will not affirm, Mr. Bowden?

THE DEFENDANT: No, I don't swear. I'm not affirming.

THE COURT: Okay. Well, let me ask you some questions.

Have you received the Presentence Investigation Report?

THE DEFENDANT: Yes.

THE COURT: Have you read that report?

THE DEFENDANT: Yes.

THE COURT: Did your attorney answer any questions you had about the PSR?

THE DEFENDANT: We didn't never go over it.

THE COURT: Do you need any more time to go over it with your attorney?

THE DEFENDANT: Yeah, 'cause it's a lot of stuff in there is lies.

THE COURT: There's going to be an opportunity to -- there already has been an opportunity to provide any corrections to the PSR in writing, and we also will discuss that during the hearing today, so I find that it's okay to proceed.

Do you have any questions for me about the PSR?

THE DEFENDANT: Yeah. I got some questions about it because according to my original PSI with the one that Danielle Steel did and Corey and her did it together, I guess, they charged me with three points for a case that happened in 1996.

And just like Judge Leinenweber said that they wasn't going to charge me and give me the three points, and he gave me the three points again if though the cases ran concurrent.

Like, he didn't understand how this operate, and he must have had a misunderstanding about what was going on because he was following the original PSI. He just added his blend and twist to it and changed some of the stuff and -- and -- and act like though he was there when this alleged anonymous letter was wrote, and he's saying what I did and how I did it if he was a psychic. Yeah.

THE COURT: Okay. So there -- we'll discuss this later, but there is a conviction for which the PSR assigned three points that the parties agree should not be assigned any points, and so that three points that you just mentioned I believe is likely that a conviction, and that conviction will not be assigned any points in the criminal history calculation at this stage and, therefore, your criminal history would be a V instead of a VI.

THE DEFENDANT: Should be a IV.

MS. BEZNER: Your Honor, I believe the Court is correct. I believe that's what he's referring to, the three points that were given that the parties agree should not be, but it's been addressed.

THE COURT: Okay.

MS. MERIN: And not, Your Honor, it's not because the conviction doesn't count, but because he terminated his service of sentence more than 15 years prior to the instant offense.

THE DEFENDANT: Same thing.

MS. MERIN: And that is why it doesn't count for criminal history points.

THE DEFENDANT: Same thing.

THE COURT: Okay.

THE DEFENDANT: And, excuse me, Your Honor, and it wasn't -- it wasn't ran concurrent, Your Honor. It's ran consecutive.

One case was 1996, and I supposed to been discharged off it 'cause they only gave me four years. So four years at 50 percent, you only do 18 months.

So I would have ended my -- my parole way before the 13th, 2013, way before that, but I end up getting three points for that.

MS. BEZNER: You're not getting the three points.

THE DEFENDANT: Listen. Just listen.

I end up getting three points for that originally with my original sentence from Judge Leinenweber, so I had three points was added on to my guidelines when it wasn't even supposed to be added on, so I did extra time, and I supposed to have been out because according to my out date, it's in '27, but originally though when they take and give you your 54 days for each year, it -- it happened to be in, like, 206. But if I would have had originally not got the three points though, I would have got out in '25 or the early part of -- I mean, the late part of '24.

So I did extra time on this because they didn't calculate it right. And I brought it to Judge Leinenweber attention, too, and he ignored it, and -- and I kept putting it in and letting him know that, and Corey kept blocking me because he had incentive to block me because he was mad at me. So I did extra time for nothing.

THE COURT: So which paragraph is the conviction that we've just been discussing?

THE DEFENDANT: It's on -- it's on page 16 at 80. No. 80.

THE COURT: Is that right, from the attorneys?

MS. MERIN: Yes, Your Honor.

MS. BEZNER: Correct.

THE COURT: And the reason that does not count now is because it's been more -- again, it's not that the conviction doesn't exist or it's gone --

THE DEFENDANT: Hey, I didn't say that, I didn't say that.

THE COURT: -- but it does not accrue criminal history points --

THE DEFENDANT: Correct.

THE COURT: -- because the end of the service of the sentence was more than 15 years before this offense.

MS. BEZNER: Correct, Judge. And I believe the government addressed that in their sentencing memo on page 9.

THE COURT: Okay.

MS. BEZNER: And that's exactly it. The conviction absolutely does exist. It was just as the government stated, it was more than 15 years.

THE COURT: Okay.

MS. BEZNER: So we spoke before memos were filed when previous counsel for the government had the case, and my understanding and my recollection from the conversation with Mr. Rubenstein is that had also been agreed to in the 2019 case, and so the government was seeking consistency in their position in both of Mr. Bowden's cases.

THE COURT: Okay. So criminal history points were not assigned in the 2019 case either for that conviction?

MS. BEZNER: Correct.

MS. MERIN: That's correct.

THE COURT: Okay.

Okay. So the criminal history points, not including those three points from that 1996 conviction that's in PSR paragraph 80, so excluding those three points which everyone agrees are not -- should not be included, the total criminal history points are 12 and, therefore, the Criminal History Category is V.

MS. BEZNER: I believe it's 11, but the category is the same. Yes, it's Category V.

THE COURT: Okay. So going through the other

paragraphs of the PSR that list convictions and the points, I think it is a total of 11, but it doesn't -- either way, whether it's 11 or 12, it is Criminal History Category V because -- let's just make sure the points are correct.

So we exclude paragraph 80 -- going through the convictions section, which starts at paragraph 73, there are -- all of these from paragraphs 73 through 80 are zero points.

Paragraph 80, while the PSR says three, we just discussed is zero points. So starting with paragraph 81 that is three points. 82, zero points. 83, zero points. Paragraph 84, one point, which is now a total -- running total of four. Paragraph 85, one point, running total of 5. Paragraph 86, three points, running total of 8. Paragraph 87, zero points. Paragraph 88, three points, taking the complete total to 11 for the criminal history points, total criminal history points.

THE DEFENDANT: No, it ain't.

THE COURT: Therefore --

THE DEFENDANT: No it ain't.

THE COURT: -- Criminal History Category V.

MS. BEZNER: Well, you're wrong.

THE DEFENDANT: Your Honor, excuse me.

THE COURT: Yes.

THE DEFENDANT: Hey, let's go back to 84. Okay, 84, I pleaded guilty, though, they say for retail theft, okay, for

two days though.

According to the document, it states that you got to have far as -- what's it's name -- you got to be in jail for more than a year and a day in order for you to accumulate points though. It is. They say that.

MS. BEZNER: No.

THE DEFENDANT: So -- okay.

All right, I'm saying what the definition -- that's what it say, the definition instruction for computing criminal histories, that ain't none of me. I ain't make it up.

(Defendant and counsel conferring.)

THE COURT: Okay. So it's 4A1.1(c). It lists that in the PSR as the section under which -- we're now talking about paragraph 85 of the PSR.

If you go to the fourth column from the left, it gives the guideline cite, and it cites 4A1.1(c). And that, when you look at 4A1.1(c), it says add one point for each prior sentence not counted in (a) or (b) up to a total of four points for this subsection. So that's the basis of that one point. It doesn't require a particular length of the sentence of imprisonment, unlike (a) and (b), which do have that.

THE DEFENDANT: Okay. Excuse me, Your Honor. I want to show -- I mean, I want to explain something to you, too, about 85 and 86. 85, I want to explain to you, I had got the 24 months' probation, 130 hours community service, and a $440

fine. And the fine -- I mean, a fine satisfied by time served. Okay, now it gave me a point for that. But I took two years in the Department of Corrections for 86, for 85 and 86 together and got two years, and I pleaded guilty and I got one year in the Illinois Department of Correction and the minimum mandatory supervision release, and I got fined $719. So 25 -- I mean, 85 went with 86, so it was combined.

So that's why I pleaded guilty, and I pleaded guilty before -- for both of the cases though. So they gave me a point for 85, and they gave me a point for 86 though. They gave me one point for 85 and one for -- and three points for 86, which I wouldn't have never got three points for 86 though. If I did get three points at 86, I wouldn't have got a point for 85 because 85 and 86 is ran concurrent. It's not consecutive. It's concurrent.

THE COURT: Okay. So the -- but the thing that determines whether each of those paragraphs, 85 and 86, get points assigned to them separately is that they are separate convictions.

So it's not whether those sentences ran concurrently. They're separate convictions, so they, under the guideline we just looked at, 4A1.1, they get calculated separate criminal history points according to 4A1.1, and then you're looking at the different subsections of 4A1.1, and that's how you get -- under 4A1.1(c), paragraph 85, that does get one point. And

then under paragraph 86, under subsection 4A1.1(a), that does get three points because of the length of the sentence.

But it doesn't -- again, it doesn't matter whether you pled guilty at the same time to both of them. It doesn't matter whether the sentences were running concurrently. They are separate cases, separate convictions, so they get assigned points separately, as it's shown in paragraphs 85 and 86 of the PSR.

Also, even if one of those -- if the one point in 80- -- so this looks entirely correct to me. I don't see why that calculation would change. But if, for example, the 85 dropped out, that would subtract one criminal history point, which would take the total criminal history points to 10, meaning it would still be Category V. So I just don't -- it doesn't make a difference, but it also is correct, so I don't -- that does not change the criminal history calculation.

Okay. Any other questions for me about the PSR, Mr. Bowden?

THE DEFENDANT: Yeah. Let me look for it right quick. I just want to straighten it out because a lot of things that I had spoke to the probation officer on the phone about, a lot of stuff like the names of my children and names of the other -- baby mothers and other individuals though, I wanted him to add to the PSI. He didn't add them in correctly. He misinterpreted the spelling of the names, and he just wrote

whatever he thought he heard though, and then I thought that was unprofessional though on him.

And then the things that -- that was supposed to go in the PSI, about him saying that I did this, I wrote this, and this and that, he didn't know nothing about that because he wasn't there, but he got -- he did what he felt like he want to do, and I thought it was rude of him because he didn't contact me to ask me what was going on, or he just felt like he could do what he want to do like a lot of them always do.

They can't do what they want to do. I can't do what I want to do. It's rules for everybody because he got a job. I understand he got to do his job, but he got to follow the protocol, too, as well. He's not special.

THE COURT: Okay. Mr. Bowden, any corrections?

THE DEFENDANT: Yeah. It's corrections with my childrens and the names -- and my daughters, it's a lot of corrections there.

And then he didn't -- and I requested him to add my daughter, her name is Alexis Spears, and I guess he didn't get the memo because I didn't even know nothing about his address or something where I can confirm it with him or I can write him and explain to him that some of the stuff that he had wrote in the document was not factual. He didn't have facts.

THE COURT: Okay. I -- so, I mean, there is some information, paragraphs 146, 147, 148, 149, 1 -- well, it's

really -- I mean, there's a personal and family data section that runs from paragraphs 142 through 152.

THE DEFENDANT: Okay. And I got a page in the PSI in the back --

THE COURT: It's on pages 30 and 31.

THE DEFENDANT: Okay. Yeah, a lot of these names is spelled wrong.

THE COURT: Okay. Well, I -- you know --

THE DEFENDANT: You need -- you need the names to be spelled --

MS. BEZNER: Well, tell us how to spell them. Go.

THE DEFENDANT: Wait.

MS. BEZNER: We don't need to talk about why they're misspelled. Just spell them.

THE DEFENDANT: I'm not speaking to you though. You're not the judge.

MS. BEZNER: What names are misspelled so we can clarify it?

THE DEFENDANT: Your Honor --

MS. BEZNER: How is it supposed to be spelled?

THE DEFENDANT: I wanted to bring to your attention in this PSI on page 2.

MS. BEZNER: Let's -- one thing at a time. Let's do the spellings first, and then we'll come back to it, okay?

How do you spell Iona's name?

THE DEFENDANT: We can just do it like this here. Why don't I just give you all the spellings.

(Defendant and counsel conferring.)

MS. BEZNER: Judge, would the Court allow me to, after the sentencing is concluded, I don't believe that the spelling of his children's name is pertinent to the Court's decision on a sentencing number, I would be happy to have my client clarify spellings with me and I could file a supplement. I don't know if that works for BOP purposes, but just to speed this along.

THE COURT: Does anyone have any issue with that from probation or the government?

PROBATION OFFICER: No, Judge. I can make those revisions as soon as I get that update.

THE COURT: Okay.

PROBATION OFFICER: No problem.

THE COURT: Okay.

(Counsel and defendant conferring.)

THE DEFENDANT: And can we go to page 2 in the PSR at the back?

THE COURT: Yes.

THE DEFENDANT: I want to read something to you.

THE COURT: Page 2?

THE DEFENDANT: Yes.

THE COURT: Okay.

THE DEFENDANT: Okay.

MS. BEZNER: That's the -- I believe that's in the government's version of the offense.

THE COURT: Okay.

THE DEFENDANT: Yeah, the government version, correct. Thank you.

MS. MERIN: Judge, the government's version is not at issue here. The PSR is what controls for fact finding purposes.

So I would ask if the defendant has the same objection to the PSR, to identify where it is in the PSR.

THE COURT: Okay.

THE DEFENDANT: So she said she want what?

THE COURT: So the government's version is an input to the PSR, so that's a document that the government files during the probation officer's preparation of the PSR.

THE DEFENDANT: Correct.

THE COURT: Now that we're at sentencing, we have the PSR itself. So I'm looking to the PSR to find the facts for purposes of sentencing.

THE DEFENDANT: Okay.

THE COURT: And so what the government's asking is if you have an objection to the facts as relayed in the government's version of the offense, then we need to know where -- and that same fact that you're objecting to is in the PSR itself, then we need to know where in the PSR that fact that

you're objecting to is listed so that I can make a finding on whether that fact as relayed in the PSR itself is accurate.

(Counsel and defendant conferring.)

THE DEFENDANT: Okay. On page 6 in the PSI, 10 and 12.

THE COURT: Paragraphs 10 and 12 of the PSR?

THE DEFENDANT: Yeah.

THE COURT: Okay.

THE DEFENDANT: Okay. I'm going to read it to you: The defendant also wrote about women suffrage. Women just got the right to vote a little more than a hundred years ago. The defendant concluded the letter by state I have something other than this I would like to send to you. Be safe. Okay. It say during the late -- I mean, of note during his late -- later FBI interview, the defendant acknowledged his animosity towards Officer Stern -- yeah, Officer Stern stating, among other things, that she was acting nasty during the sentencing hearing, that she was getting into my business, that she got in front of the judge and became the devil's advocate and said things that I never said and that she was telling lies to the judge.

Okay. I didn't never say I had animosity towards her. I never stated that, period. Like I was -- like I was angry at her or nothing like that. I never -- I never provoked that energy to the FBI, period. I never provoked that to the

probation officer. I never stated that. That's a lie. And I don't want to be lied on like though I had animosity towards her because I didn't.

And then 12 states, it say: But defendant was not done with Officer Stern. Instead, he authored and caused to be mailed to her an anonymous typewritten letter. The threat letter. Which wasn't even a threat letter, and I didn't have nobody to type it nor did I have anybody to send it though.

I'm saying because according to the protocol inside the MCC and any other Bureau of Prisons, they got to look at your mail to see what's going out, so they investigate the mail. That's they protocol. So how did I have a letter inside another letter and they sent it out?

They don't even operate under that act though. So the FBI, the special agents, should have knew that because they special agents, and so it's saying that -- then it states another thing which he signed as your mystery man. Then among other things, he wrote about catching her in the bathroom, having her think about being raped.

Hey, I didn't never say none of this here, period, though because I didn't ever -- after the letter, I didn't never say any of this here, so I'm being accused of something I didn't even say or did though. But I'm accepting the punishment of being prosecuted because the special agents investigated me and investigated the individual, which would be

Anthony Fleming, but they charged me with a threat and when, in fact, when I looked up 876(c) it didn't even state a threat. A threat according to -- according to the document, it say -- it say when you make a threat, it say I don't like you or I dislike your behavior is not a threat. But it say I will hurt you if you do that again, or you are going to pay for what you did is a threat.

That's a threat. I never -- in the body of the letter that I allegedly read that they gave me, it don't say none of that. So evidently the prosecutor is incompetent and the FBI is incompetent because what they did, they -- they fabricated a story and put it together, and Corey orchestrated it to help it out so it can come out like they wanted it though.

So they -- they never did elaborate on what was a threat or what was a threat in the body of the letter. They just said it was a threat. A threat could be only a threat if -- if -- if -- if you threaten an individual with the language, though. So in the body of the letter, I never seen in the language it was a threat though.

So I'm being charged, I'm finna to go to jail and do some time for allege, a mystery letter. Allege, a fantasy letter. Allege because the FBI don't like it.

Well, I just wanted to say that though. I don't like how -- how -- how they present me as being this individual when I'm not though, and then it's all right for them to think,

like, okay, they can lie. They special agents because they can lie.

They can't lie. They can lie because they lie all the time, but that's not they -- that's not they protocol. Am I right?

THE COURT: Well, okay, so those are basically arguments, I mean all those last arguments about the statute, those are about, those are arguments that get at your plea and the basis of the conviction, and I've already denied the motion to withdraw the guilty plea.

The argument about paragraph 10, about -- so the acknowledged animosity, so where it says, "Of note during his later FBI interview, the defendant acknowledged his animosity toward Officer Stern," then it keeps going, and it goes on to quote your statements.

So that, in paragraph 10, that -- that specific phrase, "the defendant acknowledged his animosity towards Officer Stern," that is a characterization of the other statements, which are -- the later statements in that same sentence are actual quotes from the FBI interview. And I -- I guess I don't -- I mean, those quotes, I think it's a fair characterization of those quotes to call them acknowledging animosity.

I mean, it's that she was acting ""nasty" during the sentencing hearing; that she was getting "into my business";

that she "got in front of the judge and became the devil advocate" --

THE DEFENDANT: That's all I said --

THE COURT: -- "sic."

THE DEFENDANT: And then, Your Honor, for the record though, okay, I had wrote Danielle Steel a letter, and when I wrote Danielle Steel a letter, I used my signature. And not only did I use my signature, I wrote on the envelope. So I didn't have no problem sending her no letter whatever I wanted to say to her because I felt like I would address any issue I had with anybody in the world on my own accord.

I don't need nobody to represent me or quote what I want to tell somebody even if they don't like it or not, but I'm able to come before you in this court and let you know, hey, I didn't have a problem writing her.

And then if she didn't like what I was writing though and she said don't write it no more, yeah, I don't have a problem with doing that because it came to my attention that she said she didn't like the letter, but the letter didn't have nothing violent in it. I was just expressing that -- my viewpoints on how I felt, and that was it though, so I had a right because of the First Amendment.

But I never did degrade her or talk to her in a way where she feel threatened by it or nothing like that. And not only that, I had brought it to special agents' attention, I

didn't have a problem with that, but they took the letter all out of context and then for -- for -- for what I wanted to understand was that now she stated out of her own mouth, it's inside the PSI, that I called her a bitch in the courtroom, which I didn't though, and she say I called her a bitch. So now she was in front of Leinenweber, she's saying that the reason why she ain't tell Leinenweber I called her a bitch is because he was sentencing me.

That's it -- that's -- that is crazy, and you know it's crazy. If I'm feeling threatened from anybody and I'm a court officer and my allegiance is to the court and this judge is my employer, I'm-a tell him what's going on. I don't care what he say. I'm-a tell him what's going on.

She didn't say that. Then she went back to her job and stated that she told her supervisor. That don't even make no sense. That's crazy, and you know it is though.

MS. MERIN: Your Honor, may I respond briefly as to this category of objections?

THE COURT: Yes.

MS. MERIN: It appears that the defendant is objecting to the facts as established by his plea of guilty. I don't have a transcript of the plea, but he pled guilty to all three of these before Your Honor.

If his objections are now seeking to relitigate that, to falsely deny or frivolously contest what he's already

admitted, I will suggest that we will probably be here for the next two days while he objects to trial evidence that has come in and to a plea of guilty he has already entered.

THE DEFENDANT: That's not true.

MS. MERIN: He has made his motions, five of them, to withdraw his plea. Your Honor has denied all of them.

His next recourse for all of these issues to the extent to which any of them are preserved on appeal, but he's certainly continuing to object, his next recourse for those issues is the Seventh Circuit.

THE DEFENDANT: That's not true.

THE COURT: It actually -- that's correct. So --

THE DEFENDANT: Hey, so you mean to tell me, Your Honor, I'm talking about -- so you wouldn't try to vindicate yourself, Your Honor? I'm talking about if you felt like -- and while I was up there and I pleaded guilty, I'm looking you in your eye while I was pleading guilty, and I was only pleading guilty because I know where it was going to sway to.

And not only that, I would have never accept no blind plea. I was told by my standby counsel to plead guilty because that y'all was going -- the jury was going to find me guilty the way Rubenstein presented the case though. So he's saying it's better for me to plead though.

So I would never plead then, plead to the special agents' interview and they lie, so I can get another case

though? They added another case to me. If I had never spoke to the agents, I wouldn't have even had that case that they added to me though.

THE COURT: Okay. So, Mr. Bowden, all those arguments are also things that you've been raising in your motions to withdraw the plea, and it's just -- we need to move forward, and you have preserved those objections --

THE DEFENDANT: I understand.

THE COURT: -- for appeal.

THE DEFENDANT: Okay. I understand, but, hey, but I just wanted to let you know for the record, Your Honor, hey, when I pled guilty and I felt as though you was going to find me guilty anyway or the jury's going to find me guilty because everything I was trying to express to the -- to the jury or establish for exhibit you was denying everything, Your Honor. You didn't give me -- you didn't give me the benefit of the doubt for nothing. So I didn't -- I didn't have no win with you, Your Honor, period.

THE COURT: Okay. So, again, those are arguments you've been raising in the motions to withdraw the plea.

So let's move to the next step which is --

THE DEFENDANT: Come on.

THE COURT: -- going through the sentencing record to make sure I have the complete sentencing record.

So the documents that I have are -- I'm going to list

them now, and I'm going to ask whether anyone understands there to be other parts of the sentencing record that I didn't mention.

So I have the Presentence Investigation Report, Docket 81.

The sentencing recommendation, Docket 82.

The supplemental probation report and attached victim impact statement, which is Docket 83 and its attachment, 83-1.

The government's sentencing memorandum, Docket 84.

The defense sentencing memorandum, Docket 85.

A supplement by the government to the sentencing memorandum, which is Docket 90, as well as the attachment, which is Docket 90-1.

I -- subsequent to that, there have been various pro se filings which I've referred to before and we've addressed in different hearings. These are not so much sentencing filings, but they were -- I'm just going to list them because they followed in chronological order the other items I just mentioned. That would be Docket 92, motion to withdraw the guilty plea.

Docket 94, motion for a Bill of Particulars.

Docket 95, motion to withdraw guilty plea.

Docket 98, affidavit of fact, writ of discovery.

Docket 99, reservation of rights.

Docket 100, affidavit.

Docket 101 is a notice of appeal.

Docket 102 is notice of appeal due, which is the Seventh Circuit document. There are some other appeal-related filings. Again, the appeal is not part of the sentencing record, but those are here on the docket at 103 and 104.

There's a response by the government at Docket 105 to the pro se filings at Dockets 98, 99 and 100.

There is the most recent motion to withdraw the guilty plea, Docket 106, which I already mentioned.

And then there is a government's sentencing supplement, which is Docket 107.

So let me just ask -- I guess I just want to be really clear. I'm not considering the fact or existence of the appeal as part of the sentencing, but apart from that, is there -- I guess is there anything else that I haven't mentioned that the parties understand to be part of the sentencing record?

MS. MERIN: Nothing from the government.

MS. BEZNER: No. I think Your Honor has it all.

THE COURT: Okay. Thanks to the probation officer for the report.

Now turning to corrections to the PSR. We did address some of these earlier, but let me just ask does the government have any corrections to the PSR?

MS. MERIN: No, Your Honor.

THE COURT: Does the defense have any corrections to

the PSR?

MS. BEZNER: No, Your Honor.

THE COURT: Going on to the guidelines. Are there any guidelines disputes?

MS. MERIN: Only with respect to acceptance of responsibility, Your Honor.

THE COURT: Okay.

MS. BEZNER: I believe that's correct.

THE COURT: Okay. Do the parties want to present any argument on that issue?

MS. MERIN: Judge, I can do that.

I would note that when the PSR recommended acceptance of responsibility, that was based on the defendant having pleaded guilty and based on their -- his cooperation during the presentence interview. That was the rationale provided by the probation officer in the PSR.

Now, the government -- since that time, the defendant has ticked off almost every element in 3E1.1 that indicates that he did not accept responsibility. He has for the last hour or so been falsely and frivolously contesting his offense conduct. He has repeatedly attempted to withdraw his plea.

As the government noted in its sentencing supplement, he emailed a friend and asked her to look up information on the probation officer victim in this case, additional information about where she was and what she was doing.

There's no purpose for that quest other than to continue to find information on that probation officer, to continue to threaten her.

That is continued criminal conduct --

THE DEFENDANT: Object.

MS. MERIN: -- directly relating to the conviction. That is inconsistent with acceptance of responsibility.

You have heard the defendant today, in previous days in his filings now turn his attention to Corey Rubenstein, who was the prosecutor previously assigned to this case, and allege that he has orchestrated this case, that he had a vendetta against him and other totally baseless lies, again demonstrating that the defendant has failed to accept responsibility for his own conduct.

On May 20th, 2025 in this courtroom on the day defendant was supposed to be sentenced, he said, "I'm not even guilty of this matter." That is just irreconcilable with acceptance of responsibility. He has refused today to be put under oath, whether to swear or to affirm. He's persisting in claims Your Honor has previously rejected, taking the position that he's a sovereign citizen. He just lied to your Court --

THE DEFENDANT: Objection. I didn't never say --

MS. MERIN: -- he just lied to the Court --

THE DEFENDANT: I didn't.

MS. MERIN: -- about whether or not --

THE COURT: Sir, you'll have a chance to respond after this.

MS. MERIN: Thank you, Your Honor.

He just lied to the Court about whether or not he reviewed the PSR, claiming he had not reviewed the PSR and then clearly had reviewed it because he was able to go immediately to the sections that he had objections to and had very specific objections as to whether certain names were misspelled or what facts were contained where.

None of this conduct is consistent with acceptance of responsibility. It's beyond inconsistent with acceptance. If there's acceptance plus for extraordinary acceptance, this is negative acceptance. It's acceptance minus. There's nothing about defendant's conduct that indicates that he has done anything near what would be considered acceptance of responsibility and still is denying any responsibility and any culpability for the offenses he has pled guilty to.

For all those reasons, Judge, it's the government's position that the defendant should not get a reduction for acceptance of responsibility.

(Defendant and counsel conferring.)

MS. BEZNER: Your Honor, I addressed I believe in my memo the defense's position on acceptance of responsibility.

I believe that, as the government correctly noted, Mr. Bowden was cooperative with the probation officer in

preparing the Presentence Investigation Report, and he did plead guilty. I understand that the Court has a lot of discretion here in whether or not to grant acceptance of responsibility, but we are taking the position that because he did plead guilty and he has, you know, showed up, participated, and been cooperative, that he should receive a reduction for acceptance of responsibility.

THE COURT: Okay. So -- sorry, just bear with me one second.

(Pause.)

THE COURT: Okay. So under the application notes to Section 3E1.1 under the guidelines, which is the guideline for acceptance of responsibility, that Application Note 1 has a number of factors that are non-exclusive, but they're appropriate considerations in determining whether a defendant qualifies for acceptance of responsibility under 3E1.1(a).

Just to back up quickly, 3E1.1(a) itself just says simply, "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by two levels."

So, I mean, it's pretty open-ended, what does it mean to clearly demonstrate acceptance of responsibility for his offense. And then, of course, 3E1.1(b) deals with an additional potential decrease in the offense level for one point, but that only comes into play if the defendant clearly

demonstrates acceptance of responsibility for his offense under 3E1.1(a).

So, really, we're looking at the 3E1.1(a) issue in the first place, has Mr. Bowden clearly demonstrated acceptance of responsibility for his offense? In order to determine that, we look to the factors in Application Note 1, and I would find a lack of acceptance under especially 1(a), 1(b) and 1(h).

So 1(a), that's truthfully admitting the conduct comprising the offenses of conviction, and that, you know, I would -- I would say on that point, Mr. Bowden did plead guilty, but then has moved to withdraw the guilty plea several times; has made statements in the May 20, 2025 hearing, as well as today, that are essentially contesting the guilt, the factual basis as well as the legal basis for the guilt.

Now, perhaps -- so I wouldn't -- I wouldn't hold a legal argument against anyone for purposes of applying this section, but it's the factual basis that really matters and that Mr. Bowden appears to still be contesting despite having pleaded guilty.

So in addition at trial, Mr. Bowden proceeded to -- or through the government's case, basically had the government put on their whole case, which included having the victim probation officer testify, and Mr. Bowden, who at the time was representing himself, was able to cross-examine the victim probation officer. Only after the government presented its

whole case, including that testimony of the victim and cross-examination by Mr. Bowden, did Mr. Bowden then plead guilty.

So I -- I would find that this factor 1(a) cuts against -- in Application Note 1 cuts against a finding of acceptance of responsibility.

In addition, 1(b), that factor is voluntary termination or withdrawal from criminal conduct or associations, and here I would find that that factor is also not met because of the email that Mr. Bowden sent to a friend around a week before the May 20th, 2025 scheduled sentencing.

That's the email where it was essentially asking the friend to look up more information or to look up information on the victim probation officer, and that happened, you know, very late in the process because that was, again, around a week before the last scheduled sentencing.

So that's well after the trial, well after the guilty plea. In the immediate leadup to what was supposed to be the sentencing originally on May 20th, there is this email from Mr. Bowden to a friend asking the friend to look up information on the same victim probation officer.

So that is -- I mean, I would say that that's very clear lack of acceptance of responsibility. That's one of the clearest indications of not having accepted responsibility because it's a continuation of -- of the problematic conduct.

And then 1(h), the timeliness of the defendant's conduct in manifesting the acceptance of responsibility. Actually that, what I mentioned before about the timing of the plea and the fact that Mr. Bowden had the government put on its whole case and including the testimony of the victim probation officer and cross-examining that officer, that is -- that really is the factor, the timeliness of the conduct in manifesting acceptance of responsibility.

I would find that it is untimely because of that, that timing of the plea coming after the government's case and the cross of the probation officer.

So I -- I would not deduct the two points under 3E1.1(a) because I don't find that Mr. Bowden has clearly accepted responsibility.

Okay. So are there any other guidelines disputes?

MS. MERIN: Judge, I think we're at 21 now as the combined adjusted offense level, is that accurate based on your ruling?

THE COURT: Yes. I -- let me just doublecheck that.

(Counsel and defendant conferring.)

THE COURT: Okay. The offense level computation is at -- it starts at paragraph 42, page 11 of the PSR. It continues from there on to subsequent pages, and all of this going forward from paragraph 42 looks accurate to me except that I would not apply the acceptance of responsibility

decrease that's reflected in paragraph 66 of the PSR.

So that entire calculation would remain the same with the one exception of paragraph 66, where I would change that subtraction of two points to zero, which would then change paragraph 67, the total offense level, from 19 in the PSR to 21. So the total offense level would be 21.

Okay. So let me just say the final guidelines calculation and then ask the parties for confirmation.

And, actually, let me -- before I do that, let me just ask whether -- so if the total offense level is 21 and the Criminal History Category is V, then under the table, the sentencing table, the guidelines range would be 70 to 87 months.

Would that affect the guidelines range for supervised release or the fine recommended under the guidelines?

MS. MERIN: No, Your Honor. Those are based on the statutory maximums for the offense, the sentencing categorization.

THE COURT: Okay.

PROBATION OFFICER: The fine table is different.

MS. MERIN: Oh, I'm sorry. The probation officer has indicated the potential fine may change.

(Probation officer and prosecutor confer.)

MS. MERIN: Okay. I'll just ask, if you don't mind, Your Honor, could the probation officer just put that on the

record since he clearly knows what he's talking about.

PROBATION OFFICER: Yes, Judge, the only thing that would change within the fine table, and now we are looking at the fine range between 15,000 and 150,000.

THE COURT: Okay. No change to the supervised release guidelines?

PROBATION OFFICER: No, Judge. Those would remain the same.

THE COURT: Okay.

Okay. So let me now say the final guidelines calculation and then ask everybody to let me know whether you have -- whether that's correct, given my ruling on acceptance.

So the total adjusted offense level is 21. The Criminal History Category is V. The recommended guidelines sentence is 70 to 87 months. The recommended fine range is 15,000 to $150,000. The guidelines recommend a term of supervised release of one to three years. And there is a $100 special assessment per count of conviction. And there are three counts of conviction, so it would be a total of $300 of special assessment.

Okay. Let me just ask for confirmation of that calculation from probation.

PROBATION OFFICER: Yes, Judge, that's correct.

THE COURT: Okay. And the government?

MS. MERIN: Judge, yes, that's correct, although I do

want to put one item on the record just to be clear.

What I failed to realize when we were discussing his criminal history points is he does receive an additional criminal history point, bringing the total to 12, because he committed the instant offense while under a criminal justice sentence. That's in paragraph 90 of the PSR.

Your Honor was correct. There are 12 total points, 11 of which comes from convictions and one by operation of the guidelines.

None of that changes the Criminal History Category. I just wanted to be sure it was clear on the record.

THE COURT: Okay. Thanks. And I do see that in paragraph 90 of the PSR.

The defendant's criminal history points under subsections (a) through (d) of guideline 4A1.1 total 7 or more points. That's true here. And the defendant committed the instant offense while under a criminal justice sentence for Docket No. 19 CR 924-1. Therefore, one additional point is added. That's under guideline 4A1.1(e).

So the total criminal history score is 12, and that doesn't change the Criminal History Category. It's still V. And it doesn't change the guidelines calculation I just gave, which, again, is 70 to 87 months, one to three years of supervised release, 15,000 to $150,000 fine, $300 special assessment.

Okay. Thank you for that clarification.

And let me just ask the defense do you have any -- I understand you have -- you were requesting the deduction for acceptance of responsibility and so that's preserved, but given my ruling, do you agree that that's the correct guidelines calculation?

MS. BEZNER: I do, Judge.

THE COURT: Okay. We're going on next then to the conditions of supervised release.

Ms. Bezner, did you review the language of the proposed conditions in the PSR with Mr. Bowden?

MS. BEZNER: I did. It has been a while, but we did go over it back in January.

THE COURT: Okay. Do you agree that I can refer to the conditions in summary, understanding that I'm adopting the language that is in the PSR?

MS. BEZNER: Yes.

THE COURT: In other words, do you waive verbatim reading?

MS. BEZNER: Yes, we'll waive reading.

THE COURT: Do you also waive an explanation of the reasons for imposing the conditions?

MS. BEZNER: Yes.

THE COURT: Mr. Bowden, Ms. Bezner says I don't have to read the conditions of supervised release out loud to you,

and I don't have to explain why I think the conditions are appropriate.

Is that right?

(Counsel and defendant conferring.)

THE DEFENDANT: I'm not agreeing to that.

THE COURT: Okay.

THE DEFENDANT: I'm not agreeing to it.

THE COURT: We'll go through the supervised release conditions in a moment.

Are there any objections to any of the proposed conditions in the PSR?

MS. MERIN: No, Your Honor, not from the government.

MS. BEZNER: No, not from the defense.

THE COURT: Okay. We're going to go through the conditions that are listed in the PSR, which are the conditions I intend to impose.

And at this time, I do intend to impose -- well, let me just ask does anybody have any argument as to the length of the term of supervised release?

MS. MERIN: Judge, the government has asked in its filing that Your Honor impose a three-year term of supervised release. I believe that the Probation Office and defendant are recommending two years.

The reason for the three years in brief, we've already stated in our filing, but I think has been illustrated by the

defendant's conduct in court today is that additional supervision is required to protect the public and to ensure that he follows the rules of supervised release.

THE DEFENDANT: Objection. I object to that.

THE COURT: Okay. Any argument from the defense as to length of term?

MS. BEZNER: Briefly, Your Honor.

THE DEFENDANT: I already got three years to do.

MS. BEZNER: As Mr. Bowden correctly pointed out, he does already have supervised release time to serve on his 2019 case, and my argument would just be similar to the argument that I made in my sentencing memorandum is that by the time Mr. Bowden -- without knowing what amount of time the Court is going to impose, I mean, looking at a guideline sentence and, you know, the 70-to-87 months range to -- actually today is Mr. Bowden's birthday. He turned 64 years old today.

He is going to be, if the Court gives him a guideline sentence, he's going to be well into his 70s by the time he is released, and I think that the Court is certainly familiar with the resources that are required to both imprison and supervise elderly individuals.

And I understand the government's point about supervision, but I think that resources can probably be spent elsewhere other than, you know, keeping tabs on an elderly man. So we would ask for two years.

THE COURT: Okay. I, just -- my comments now are subject to my consideration of the 3553(a) factors at the end, but in terms of the length of term of supervised release, I do intend to impose a three-year term because I think that length of term is necessary for the protection of the public and to ensure, to the extent possible, that Mr. Bowden has -- is engaging in lawful behavior and that the Probation Office has the necessary tools to monitor his behavior, and those contribute to public safety, for safety from future criminal conduct.

Going through the conditions, let's just walk through them. They're in the PSR. So I intend to impose Mandatory Condition 1. This is starting at page 36 of the PSR.

Again, I intend to impose all the conditions that are checked in the PSR. So first of all, it's Mandatory Condition 1, you shall not commit another federal, state, or local crime.

2, you shall not unlawfully possess a controlled substance.

5, you shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.

6, you shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter up to 104 periodic tests for use of a controlled substance during each year of supervised release.

So those are all mandatory conditions that I've just identified so far, 1, 2, 5 and 6, and they are all necessary for deterrence against future crime and for the Probation Office to monitor Mr. Bowden's behavior, which contributes to the prevention of future crime and deterrence, and also to public safety.

THE DEFENDANT: Public safety.

THE COURT: As well as the drug testing is appropriate because Mr. Bowden has had some substance abuse issues as reflected in the PSR.

Okay. Going on to discretionary conditions. I intend to impose Discretionary Condition 4. You shall seek and work conscientiously at lawful employment, or, if you are not gainfully employed, you shall pursue conscientiously a course of study or vocational training that will equip you for employment.

Again, the requirement for employment is geared toward the prevention of recidivism, to avoid recidivism, to help Mr. Bowden be engaged in lawful and productive use of time.

Okay. Going on to Condition 6, Discretionary 6, you shall not knowingly meet or communicate with any person whom you know to be engaged or planning to be engaged in criminal activity and shall not knowingly meet or communicate with the following persons: United States Probation Officer Danielle Stern.

So that condition is geared toward prevention of continued criminal conduct and contact with the victim.

Discretionary 7, you shall refrain from excessive use of alcohol defined as having a blood alcohol concentration greater than 0.08 percent.

I'm going to impose everything I just read, but I'll skip -- there's a check box that says or check box, I'm just going to skip that check box. But I am going to impose the rest of that condition, which has to do with narcotic drug or other controlled substance.

So that Discretionary 7 will read in full: You shall refrain from excessive use of alcohol defined as having a blood alcohol concentration greater than 0.08 percent, and from any use of a narcotic drug or other controlled substance, as defined in Section 102 of the Controlled Substances Act, 21 U.S.C. Section 802, without a prescription by a licensed medical practitioner.

And so that condition is geared toward prevention of substance abuse, whether it be alcohol or controlled substances. Again, that condition is appropriately tailored to this case because Mr. Bowden has had previous issues with substance abuse as reflected in the PSR. And the avoidance of substance abuse will help avoid recidivism and assist with Mr. Bowden's ability to maintain a law-abiding life.

Okay. I intend to impose Discretionary 8, you shall

not possess a firearm, destructive device, or other dangerous weapon. That condition is appropriate because of Mr. Bowden's criminal history, which includes armed robberies. And so that's appropriate for the prevention -- for deterrence, for prevention of recidivism, and for the safety of the community.

Discretionary 9, I intend to impose: You shall participate at the direction of a probation officer in a substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year. You shall participate at the direction of a probation officer in a mental health treatment program and shall take any medications prescribed by the mental health treatment provider.

Those are intended to provide Mr. Bowden with treatment for substance abuse and mental health, and I would find that those conditions are appropriate so that, Mr. Bowden, you can be thinking clearly and getting treatment and help, which also helps keep the public safe from future criminal conduct.

Going on to Discretionary 14, you shall not knowingly leave from the federal judicial district where you are being supervised unless granted permission to leave by the Court or a probation officer. The geographic area of the Northern District of Illinois currently consists of the Illinois counties of Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle,

Stephenson, Whiteside, and Winnebago.

And so that condition facilitates supervision by the probation officer.

Going on to Discretionary 15, you shall report to the Probation Office in the federal judicial district to which you are released within 72 hours of your release from imprisonment. You shall thereafter report to a probation officer at reasonable times as directed by the court or a probation officer. That condition also facilitates supervision by the probation officer.

Discretionary 16, you shall permit a probation officer to visit you at any reasonable time, at home, at work, at school, at a community service location, other reasonable locations specified by a probation officer. You shall permit confiscation of any contraband observed in plain view of the probation officer.

That condition likewise facilitates supervision by the probation officer.

Discretionary 17, you shall notify a probation officer within 72 hours after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. You shall answer truthfully any inquiries by a probation officer subject to any constitutional or other legal privilege.

That condition also facilitates supervision by the

Probation Office. And, again, as I discussed earlier, that supervision is appropriate for deterrence, prevention of recidivism, and protection of the public.

Discretionary 18, you shall notify a probation officer within 72 hours if after being arrested, charged with a crime, or questioned by a law enforcement officer.

That also facilitates supervision by the probation officer, assists with the prevention of recidivism, with deterrence, and with -- and promotes public safety.

And then Discretionary 22, you shall satisfy such other special conditions as ordered below.

And Discretionary 23, you shall submit your person, property, house, residence, vehicle, papers, computers as defined in 18 U.S.C. 1030(e)(1), other electronic communications or data storage devices or media or office to a search conducted by a United States probation officer or officers. Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition.

An officer or officers may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time

and in a reasonable manner.

This search condition is appropriate because of the nature of this case, which involves a threat to the probation officer, and it's therefore necessary to facilitate supervision by the probation officer, for deterrence, to prevent further criminal conduct, in other words, to prevent recidivism, and for public safety.

Going on to the Special Conditions, I intend to impose Special Condition 3. You shall, if unemployed after the first 60 days of supervision or if unemployed for 60 days after termination or layoff from employment, perform at least 20 hours of community service per week at the direction of the U.S. Probation Office until gainfully employed. The amount of community service shall not exceed 200 hours.

That condition is necessary to -- to promote Mr. Bowden's staying on track and maintaining a law-abiding life and maintaining productive, lawful use of his time.

Going on to other special conditions, I intend to impose Special Condition 7, which is within 72 hours of any significant change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments, you must notify the probation officer of the change.

Special Condition 8, you shall file accurate income tax returns and pay all taxes, interests, and penalties as

required by law.

And Special Condition 10, you shall pay to the Clerk of Court -- you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release at a rate of not less than 10 percent of the total of your gross earnings minus federal and state income tax withholdings.

Those three special conditions, which are, again, Special Conditions 7, 8 and 10, I understand the rationale of those is that Mr. Bowden continues to owe substantial restitution in the Hobbs Act case from 2019, and therefore these financial-related conditions are appropriate to ensure that he continues to pay that restitution, as well as the special assessment that would be imposed in this case.

But if anybody has other points about those, please let me know.

Going on to Special Condition 11, that's you shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court.

And I intend to impose that special condition, which is appropriate given Mr. Bowden's criminal history, as well as the nature of the crimes at issue here, the threat and the chaplain -- the fabrication of the chaplain letter.

Okay. Those are all of the recommended conditions of

supervised release in the PSR. Those are the conditions I intend to impose.

Let me just ask the parties, having gone through those, whether you have any objections?

MS. MERIN: Nothing from the government.

MS. BEZNER: No.

THE COURT: Okay. Then moving on to the next step. No restitution or forfeiture is at issue, so the next step is whether there is any victim or character witness or anyone who wants to be heard.

MS. MERIN: The government is not presenting any witnesses, Your Honor.

THE COURT: Okay.

MS. BEZNER: The defense has no witnesses.

THE COURT: Okay. Next would be the arguments of counsel.

I think I said that defense would go first. I don't -- you know, either order is fine.

MS. BEZNER: I can go first. That's fine.

THE COURT: Okay.

MS. BEZNER: Your Honor, as I sort of previewed in talking about the length of supervised release, there are obviously a lot of things for the Court to take into consideration in a case such as this one. I think that one of the things that I would just ask the Court to take special

consideration of is, as I stated, Mr. Bowden's age.

He is 64 years old. He is still serving the remainder of the Hobbs Act 2019 case, and he is going to be probably well into his 70s at a time when he would be released from prison.

I -- in looking at the 3553(a) factors, I understand certainly the seriousness of the offense and to promote respect for the law.

I do think, you know, there comes a point where that sort of drops off. I think if -- if respect for the law isn't learned in five years, it's not going to be learned in eight years or ten years.

So I certainly understand deterrence for criminal conduct, you know, sending a message to the public that you can't do these things; but I also would just ask the Court to consider the factors like educational/vocational training, correctional treatment.

I don't think that there's much that the Bureau of Prisons can do for a 70-year-old man to restore him to useful citizenship. And I understand that a -- you know, the guidelines are what they are. But I think based on Mr. Bowden's age, I would ask that certainly the Court not go above the guidelines.

I did in my memo ask for a below-guidelines sentence. And, again, it is not because I or my client don't understand the seriousness of the offense, but it is because he is already

going to be serving out the end of that prior sentence, and, again, he's going to be well into his 70s.

I know that the Court is aware of the costs to the Bureau of Prisons for housing and caring for elderly people, and I think someone in their 70s certainly in normal life counts as elderly but also certainly in the Bureau of Prisons.

As I mentioned in my memo, and we all know, people in prison don't get great healthcare. They don't get great food. There's not exactly access to, you know, fresh fruit and vegetables and grass-fed beef. It's not a great way to live. And there have been studies that every year in prison really ages someone two years.

So based on all of that, I did in my memo ask for a sentence of 36 months in the Bureau of Prisons. I am going to ask for that again.

Again, asking the Court to take into consideration the 3553(a) factors. Mr. Bowden is already going to be in prison for a long time. He has already been incarcerated for a very long time. He has not had contact with his family.

To the extent that the public needs to be protected and can be protected, I don't believe that, you know, a longer sentence of imprisonment would achieve those goals.

So that is the basis for the request for the 36-month sentence.

THE COURT: Okay. Thank you.

Turning to the government.

MS. MERIN: Thank you, Your Honor.

Your Honor, the government is asking for an above-guidelines sentence here of 105 months, and I'm going to talk about each of the factors and then address some of the arguments that counsel has made.

This is an above-guidelines sentence, Judge, because I think that the defendant in this case is unique. His conduct, his conduct in this case while he was incarcerated in prison, his conduct since he has pled guilty has been truly extraordinary, and not in a good way. Extraordinary in a way that the guidelines cannot really capture the true impact and the need for the protection of the public and, frankly, the incapacitation of the defendant.

So I'm going to start with first with the factors under 3553(a), and that is the nature and circumstances of this offense.

The defendant has committed three offenses here, and each one of them is a serious assault on the legitimacy of the justice system. They are threats to a federal official, obstruction of justice, and lying to the FBI.

I want to talk first about the threat to -- the anonymous threat to the probation officer. It's important to remember, although we know now that Glenn Bowden is the person who sent that letter, when the letter was received, the

probation officer did not know who had sent it.

There was testimony at trial as to the extent of fear that caused her office, that caused her, that caused the marshals to extend protection to her, and then, you know, what -- she has spoken herself as to the impact that this has had on her life.

The anonymity was the point. The fear was the point. And the fear, the nature of the threats, not an "I'm going to kill you or I hate you," the graphic, detail, the sexual assault that was threatened in that letter is truly terrifying and truly specific to the victim. They are -- the threats were terrifying. They were demeaning. They were designed to ensure that the defendant knew that the probation officer would always be looking over her shoulder, always worried who is this person; why are they following me; this is what they want to do to me.

And for no other reason than defendant's own cruelty. It was in retaliation for her performance of her duties as a probation officer. Un -- unlike the defendant's Hobbs Act robberies, in which he gained profit from the robberies. Here, there is nothing to gain except cruelty and revenge.

The only motive was cruelty. There's no scheme to get out of jail quickly, which characterized the obstruction that's charged in Count Two. Just cruelty, just the joy that comes from knowing that you have frightened somebody, that you have

hurt somebody, and that that person will always be wondering where are you, what are you thinking, could you potentially hurt them, and that is incredibly sadistic.

The fact that it was done in retaliation for just her doing her job makes it all the more outrageous.

She did what every probation officer throughout this country does. She made a sentencing recommendation based on her evaluation of the evidence. That sentencing recommendation was, in fact, not -- Judge Leinenweber imposed a lower sentence than what the probation officer recommended. But the defendant didn't like her recommendation, so he decided to take that out on her months, months, after he was sent to prison.

Now, I mentioned briefly the probation officer's letter, and, Your Honor, I can't do justice to her eloquence, and I know you have read it, as you've read all of the sentencing submissions, but no probation officer ever wants to be where she has been. A defendant who is unhappy with a sentencing recommendation is now threatening of stalking and of rape.

Then there's an investigation. Then she's interviewed by the FBI. Then the United States Marshal Service is all up in her business, her life, how she's living her life. She's got patrols.

Then she has to go to trial. She has to testify at trial and be cross-examined by the person who is threatening

her.

Probation officers don't have an easy job, and they make it a career because they believe in serving the public, and they do it in a role that's really unique in our justice system because they both have to serve the public by presenting the Court a picture of what the defendant did in terms of determining how long he should be in prison, but also of the mitigating factors of the defendant's life and their character, again, to help inform the Court how long should this person be in prison.

They also work on the back end of the criminal justice system assisting people in reentering into society. Their work is really essential to the functioning of this court and the functioning of the system writ large.

Probation officers, whether they're presentence probation officers or they handle probation after the fact, should not have to tolerate being the subject of graphic threats of sexual assault just because they did their job, just because they recommended something that the defendant didn't like, and that's true presentencing and post-sentencing.

We can't tolerate these threats, and the seriousness of those threats are not limited by the fact that the defendant we now know is in jail when he issued those threats. The threats alone are the harm. That's why the statute punishes the threat itself, not the action.

And then, you know, the question is what happens when he gets out of prison? He has already shown that he continues to be fixated on Ms. Stern. He showed that by emailing his friend to seek more information on her just a week before the sentencing, and he showed that today. He's gone on at quite length as to how he believes, you know, she had wronged him.

Now, a 105-month sentence, frankly, would be justified based on this conduct and the continuation of that that he's illustrated before sentencing. But that, of course, isn't his only crime.

While he is in -- after he sends this letter to the probation officer, he then files a motion in front of Judge Leinenweber seeking to be released under the compassionate release provision of the statute, detailing his health issues and claiming a laundry list of health problems, and in support of that motion, he files a fabricated letter from the chaplain at USP McCreary. That's a false and fabricated document that he filed with the court to try to move the court to grant his compassionate release motion.

That alone is a significant obstruction of justice.

You know, Judge Leinenweber ultimately denied the motion. And just with respect to that denial, it's relevant to note that Judge Leinenweber noted that his health conditions were well controlled in prison and that the violent nature of his offenses gave no reason to believe that compassionate

release would be wise at that time.

Now, Your Honor, and I'll address this a little more in a minute, you've heard the defendant go on about how he believes that Corey Rubenstein conspired against him in that compassionate release motion. Mr. Rubenstein was the prosecutor in the original 19 CR case. And, of course, there's no basis at all for that.

The only person responsible for the defendant submitting a false and fraudulent letter to support his compassionate release motion is the defendant. There's no conspiracy here.

And then finally, the defendant lied to the FBI. Now, he didn't have to talk to the FBI, and he did talk to the FBI. And when he did, he falsely denied writing both these letters.

And I would note, Your Honor, that the PSR makes clear and as was presented at trial, there's DNA evidence that the defendant's DNA was found on the flaps of both the letter to Judge Leinenweber and the letter to the probation officer. This idea that the defendant didn't write this letter is frankly ridiculous.

Now, of course, again today you heard from the defendant that somehow these lies to the FBI aren't his fault because how was he supposed to know that the FBI was recording him? And he also denied lying, and that was just today.

So, Your Honor, that really brings me to his history

and characteristics. The defendant's lengthy criminal history we've already reviewed this morning, but a few things to note.

His history of violent offenses and the lack of prior lengthy sentences to deter him is not a mitigating fact. It's an aggravating fact. To say let's not impose a high sentence on him because other high sentences haven't been effective is effectively rewarding the defendant for continuing to commit crime.

He should be sentenced above the guidelines range because he has failed to comply with the law after multiple prior convictions. He shouldn't get a reduction in time because he has continued to commit offenses.

The characteristics of his earlier offenses are also significant in terms of Your Honor's concern about protecting the public. He's got prior convictions for armed robbery, assault, aggravated assault, fleeing and eluding the police as they were trying to arrest him for the Hobbs Act robberies he was convicted of in this courthouse.

I noted that in his prior conviction in the 19 CR case, that also contained a threatening component, where he threatened the victim employees that he knew where they lived.

I took a look back at Judge Leinenweber's opinion denying his compassionate release motion at Docket 192 in the 19 CR case, and one of the things he talks about is that the robbery is -- illustrated the defendant's extraordinary

propensity for violence. They were extremely violent offenses that involved the victims being restrained, brought to separate rooms and held at gunpoint.

Now, that is all his criminal history that landed him in prison in the first place, and I don't want to over -- to omit that the defendant committed these offenses while he was in the BOP, which is, of course, aggravating on its own.

You know, the guidelines enhancement for committing the offense while under another criminal justice sentence is -- typically applies because defendants will commit that offense while they're on probation or parole, not while they are literally in the BOP. And that level of disregard for the law, of an inability to conform your conduct to the law, is just truly shocking.

I recognize that the defendant in his sentencing memorandum talked about some of -- in the PSR, rather, talks about some of the factors in his life that -- and his family life that had led him originally to some of his original criminal acts.

But I would point out that at this point, we're dealing with somebody who's 64 years old. And when you get to 64 years old and you are still committing crimes, especially crimes with this level of disrespect for the law and this level of vengeance and seeking -- and kind of cruel conduct here, we can't look back at what happened, you know, 20, 30, 40 years

ago. At some point, the defendant has to conform his conduct to the law, and if not, he should be incapacitated.

What is clear in both defendant's history and in his conduct before this courtroom in advance of sentencing is that the defendant will blame literally anyone else for what has happened here. He blamed the probation officer. That's the person he directed his ire to when he was sentenced to 110 months for robbing three cell phone stores.

He has blamed the previous prosecutor assigned to this case.

He has suggested that Your Honor is in league with the prosecutor.

He has said that the probation officer currently assigned to the case somehow is making things up and putting them in the PSR.

None of this is true. It's all an indication that for the defendant, there's always somebody else to blame except for himself.

He has illustrated that he has no respect for the law, and that's been evident in this courtroom. It's been evident today. It's been evident as I watched the defendant muttering under his breath as Your Honor is issuing your rulings.

What -- that kind of conduct is truly extraordinary and, as I said at the beginning, and not in a good way. And that's -- and that's just disrespect for this Court and the

processes. It's not the seriousness of the conduct here, where he's emailing his friend to get more information on the probation officer. That's extraordinarily serious continuation of this criminal conduct.

I do want to address the defendant's arguments with respect to the defendant's life expectancy and the conditions in prison.

I don't think anybody would argue with the idea that being in prison is not as good as being out of prison. It is a restrictive environment. The defendant himself has explained to this Court this morning that he is tired of being in jail. That is what he said when he came in today.

I understand that the defendant doesn't like being in jail, and I further understand that the defendant is in his mid 60s and that a sentence will put him -- the sentence the government's recommendation -- recommending would put him into his mid 70s before he gets out, and that's not accounting for his other case.

But for this defendant who has so illustrated a total respect -- disrespect for the law, an inability to be deterred, and a real dedication to targeting people who try to hold him accountable, he has to be incapacitated. He has to be incapacitated for as long as possible.

Now, it is no answer that he has already served time and therefore no more additional time is going to help. No, it

is going to help. It is going to protect the public. Somebody who's 64 years old or 62 or so when he committed this crime is somebody who needs -- the public needs to be protected from.

You know, they say the Constitution doesn't uphold itself, and the judicial system doesn't uphold itself either. When we have somebody who's threatening a federal officer, who's obstructing justice, who's lying to the FBI, if the government does not ask for, if the sentence that's imposed is not significant, then we're essentially saying, hey, it doesn't matter.

Now, this case, it's not the *Madigan* case. It's never going to make the papers, but the sentence the Court gives makes a statement to the defendant, to people at the MCC when the defendant comes back to jail, to a community, this conduct is unacceptable, and it will be severely punished.

Judge, the people of this district, and when I say the people of this district, I mean everybody, including criminal defendants, they are entitled to a system of justice that is free from threats, deception, and intimidation. Criminal defendants especially need the services of committed and dedicated probation officers.

And when you have somebody who is striking at the root of that by threatening a probation officer for doing her job, for submitting false documents to the court, for lying to the FBI, that person is striking at the root of what this district,

what the United States needs for a functioning system of justice.

And for those reasons, Your Honor, we are asking you to impose a sentence of 105 months.

THE COURT: Okay. Let me just ask a couple quick questions. Then I will turn to the allocution.

I guess one question is does anybody know whether, based on the nature of the crimes of conviction, Mr. Bowden would or would not be eligible for good-time credits, you know, for the sentence, and I also am not -- the calculation of good-time credits is something that's for the BOP to decide ultimately. It's not something I have any say over, but I just wondered, does anyone know whether --

MS. MERIN: Judge, I'm -- I'm frankly not aware of offenses that are excluded from good-time credits.

THE COURT: Okay. Okay.

MS. MERIN: But that is -- I am looking to the Probation Office.

PROBATION OFFICER: I'm not aware of that.

THE COURT: Okay. I mean, I -- I guess --

MS. BEZNER: If I could have 30 seconds, I think I can answer that.

THE COURT: Okay.

MS. BEZNER: I have a little cheat sheet.

THE COURT: Okay.

MS. MERIN: It appears -- I would just say to Your Honor it appears to be 18 U.S.C. 3624 which governs good time, so I'll just take a look at that.

THE COURT: I mean, ultimately it is an issue for BOP in the administration of the sentence to address that, so it's not -- I don't know that it ultimately would affect the sentence.

MS. MERIN: Judge, I would just note that 3624(b) does say that a prisoner who's serving a term of imprisonment of more than one year may receive good-time credits, of course, subject to all the rules and regulations of the Bureau of Prisons. There are lots of reasons why defendants might lose good-time credits while they're in prison, and usually that's for infractions they commit there.

THE COURT: Okay.

MS. BEZNER: So I have this handy little cheat sheet that the Federal Defender puts out, and it does have a section for offenses that are ineligible for earned time credit, and based on my review of it, none of the three counts of conviction are on that list.

So 18 U.S.C. 876 is not on there, 1512 is not on there, and 1001 is not on there. So I believe he would be eligible.

But, again, subject to all of the, of course, normal requirements and circumstances to earn those.

THE COURT: Okay. Thanks.

Also, are the parties requesting -- I guess from the memos, and I know there's a guideline provision on the consecutive versus concurrent, but I just want to make sure I was clear on what are the parties' positions on that issue.

So the guideline I think it's 5G1.3. Of course, no guideline is binding, they're all advisory, and even I think under the terms of the guideline, it's not a hard-and-fast rule, but I am pretty sure that the guideline itself, this is not verbatim, but it's saying to the effect that if the sentence is committed while the person is serving another sentence, then the sentence shall be imposed to run consecutively to the undischarged term of imprisonment. That's under 5G1.3(a).

And I believe as a statutory matter, the default is that sentences run concurrently unless it's specified to run consecutively.

MS. BEZNER: Judge, my understanding is that, again, it is as the Court said, it's a shall be consecutive, so I was operating under that assumption. And, again, as I said in my argument, that was part of the reason that I asked for a below-guidelines sentence.

I think that, again, assuming it is going to be tacked onto the end of the 2019 sentence, I think that I would ask for something different if this was a stand-alone offense. But

because assuming it is going to be consecutive, that was my rationale for asking for the lower number.

THE COURT: Okay. I -- so, and let me just ask what's the government's position?

MS. MERIN: Judge, this is a separate offense. I think under the statute and the guidelines, a consecutive sentence is appropriate. This isn't relevant conduct to his Hobbs Act offense.

THE COURT: Okay. So let me just say what I understand to be the law on this. It's 18 U.S.C. 3584. That has to do with multiple sentences of imprisonment, and subsection (a) says, if multiple terms -- it's (a), imposition of concurrent or consecutive terms. If multiple terms of imprisonment are imposed on a defendant at the same time, or if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively, except that the terms may not run consecutively for an attempt and for another offense that was the sole objective of the attempt. Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively. Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently.

So let me just -- I think earlier I said the default

was that it would run concurrently unless the court orders that they run consecutively. Now just looking back at 3584(a), I think that last sentence actually changes the default to consecutive unless there's an order that they run concurrently, that the terms run concurrently, because it's multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are run concurrently.

And then 3584(b) says factors to be considered in imposing concurrent or consecutive terms, the court in determining whether the terms imposed are to be ordered to run concurrently or consecutively shall consider as to each offense for which a term of imprisonment is being imposed the factors set forth in Section 3553(a). So it just refers back to the 3553(a) factors.

Then 5G1.3, which, as a guideline is not binding, but it has the persuasive effect the guidelines have, but it's not binding, it's -- 5G1.3(a) says if the instant offense was committed while the defendant was serving a term of imprisonment, including work release, furlough or escape status, or after sentencing for but before commencing service of such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment.

So it sounds like, first of all, the statute sets the default as consecutive unless the court orders that the terms

are to run concurrently.

We look to the 3553(a) factors in determining the consecutive versus concurrent issue. And then the guideline, 5G1.3(a), although not binding, advisory as the guidelines always are, does say -- it sets consecutive as basically the default.

Okay. So any comments on that?

MS. MERIN: No, Your Honor.

MS. BEZNER: No.

THE COURT: Okay.

Okay. So let's turn next to -- well, let me ask one other question. Then we'll turn to the allocution. This is a question for the lawyers.

I know that this is not the only -- I mean, there are many factors that go into -- have to go into this, so this is not by any means the only factor, but does anyone have a position or do you have any comments on the likelihood that Mr. Bowden would follow through on any threat?

I mean, I also think that sort of question is always -- I mean, it's always at issue in every sentencing, and it's also -- I think in any sentencing unfortunately, it's -- ultimately no one can predict the future obviously, so it's one of the many aspects of the sentencing that are -- we just can't predict it with any kind of certainty.

But does anyone have -- and so I guess I could

understand if no one has anything to add, but I wondered if anyone did?

MS. MERIN: Judge, I would add that paragraph 31 of the PSR relates FBI interview with an inmate who indicated that in addition to typing the letter for him, the defendant tried to find somebody at USP McCreary who could help arrange to have the female probation officer killed. That's a recounting of what this inmate told the FBI.

I would also add, Your Honor, and this was the thrust of my argument that I made earlier, that we have somebody who is continuing to seek out information on the probation officer, for what reason I do not know, and I think Your Honor has already heard here that the defendant has significant resentment and blames the probation officer for his sentence in the prior case and has now put a significant amount of blame on Mr. Rubenstein for his circumstances in this case.

It is the government's concern, and that is why we highlighted in our argument in terms of protecting the public, that the defendant be incapacitated.

THE COURT: Okay. Any comments from the defense?

MS. BEZNER: Judge, this is one that it's -- obviously, none of us have a crystal ball. I guess my position on it would just be that being clear, I've never thought that Mr. Bowden had any competence issues, but I think that the Court -- you know, the Court has seen him in court today and

previous days.

I think it is fair to opine that there are probably some mental health issues at play that he could benefit from treatment, and the Court did order as part of his terms of supervised release in Discretionary Condition 9 that he be ordered to undergo evaluation and participate in mental health counseling, treatment, medication, whatever is ordered.

I personally am of the opinion that, you know, again, while I cannot predict whether there's an actual issue of someone's safety, I do believe that with proper mental health care and treatment, that those issues could be addressed by someone --

THE DEFENDANT: No.

MS. BEZNER: -- who is equipped to opine in those situations.

So I think that the Court did order that, and I think that that's a fair -- you know, and for anyone coming out of prison and reintegrating into society, I think that that's certainly helpful, but I think absolutely in a situation where we're concerned about the -- the safety of a person or the public, I think that that is addressed -- can be addressed by -- by the discretionary condition the Court has already indicated you're imposing.

THE COURT: Okay. Anything further from either attorney before we turn to the next step?

MS. MERIN:  No, Your Honor.

MS. BEZNER:  No.

THE COURT:  Okay.  So next is the defendant's allocution.

Mr. Bowden, you are not required to say anything, but if you would like to say something, if you would like to speak, I wanted to give you that opportunity.

(Counsel and defendant conferring.)

THE DEFENDANT:  Yeah, I'd like to speak.

First of all, I want to clear something up about my mental health, and I want to clear something up about me having a fixation for the probation officer.

First of all, I don't even have a fixation for her because I never met her until I had seen her in court during the time when I was in Judge Leinenweber courtroom.

Second of all, I wouldn't stalk a woman no way.  I don't have a problem in -- with her peer per se, because for the record, when I had spoke to cross-examine her while you was there, I had asked her a question though, and the reason why I asked her a question, I wanted to see her reaction.  And the question I asked her was that I said while we was sitting up there being -- while I was sitting up there with you being interviewed, I had you laughing for about an hour.  You still wanted to laugh though.  You enjoyed yourself in my presence at the time.  So I didn't have a problem with you.

And then in court, when she came to court and she made her recommendation, but it's not up to her when -- when -- when the last word is made. It was up to the judge. She just gave a recommendation, so I didn't have a problem with that. She could have said a thousand years, but at the end, it was up to Leinenweber. So I didn't have a problem with that.

So now far as people thinking like I have a problem with her per se, I don't have a problem with her. I'm not going to stalk that woman. I don't have a problem with her. I mean, if I seen her again today or tomorrow, I mean, if I was told or I was approached and said -- and the system said that I shouldn't be in contact with her, I don't have no problem obeying that command because, first of all, I'm not trying to make her scared of me. I don't want no woman scared of me, period. And if you look at my background, I mean, I ain't got no violent assaults where I done break nobody and kick nobody or nothing like that.

But I'm saying I got -- I got -- I got different cases that I'm being accused of, but then when you're in my community and growing up in my neighborhood, you going get different cases though because the police got a status quo anyway when you're growing up in my community though.

And then by me being the individual that I like nice things and stuff, so being that if you driving a Bentley or if you driving a Jaguar, Ferrari, police going to stop you and

they going to ask you questions or even -- even profile you saying that you doing something that you probably ain't even doing though.

But this is what they do in my community though. They stack them up in my community for a reason though. They might get them out of another community because he a rogue police, but then they got to find him a job, so they'll put him in my community. So now this is where the sentencing acts take place at.

And the reason why I say that is this here, here's the police right here that shot me, and he was a corrupt Chicago police, and they let 212 people go on his watch and still was letting people go as we speak because of just like Burge, his fraudulent arrests and stuff like that.

So we got that all the time. That's with the FBI, too. You got the Corn Tell program. You familiar with that. You familiar with all the tactics that J. Edgar Hoover used though and building up what they call data. So they build up data all the time though.

So what I was doing when I requested some information from the young lady that I was emailing, I was just wanting to know, hey, I wanted to see her portfolio statement because I wanted to use it if it was corrupt or bad or something like that. And so that's all I was doing.

I wasn't trying to use her information to attack her

with it. I was just seeing where I can use it where it can benefit me and help me out so I could show the different patterns and stuff like that that's going on in this system though, because the system is rigged up though. And so by the system being rigged, I just wanted to show, and this is what the FBI do all the time, they profile you and they build data. And this is what they do, build data. So they ask questions.

So I was asking questions and stuff. I wasn't inferring like, okay, I want to know where she live at or her movement. I don't care nothing about that. I got other things to deal with. I got family members, grand babies and all that, and my plate full far as that is, but I'm not trying to be belligerent or vexed towards nobody.

But I'm saying this here, I don't want to be accused of a crime, and I feel like I'm just being accused, and then the perpetrator on the interview who accusing me be, just like the prosecutor here, she's saying what I did, she's saying -- she didn't say what I was asked to do or what she think I did. She's saying like she knew I did this for a fact, and I'm just explaining myself I just want to clear the record because I don't want you getting the wrong impression, like, okay, yeah, I'm a callous threat. Hey, look here, I'm 64 years old. You think I'm worried about that woman? If I seen that woman today or something like this, she was crossing the street, I get out of her way because I know the outcome of somebody just saying,

oh, he did this or he said this here, because people lie all the time. We familiar with the lies. They lie all the time.

And then far as she stating that I might not get in the papers, this isn't Madigan. Okay, you say how police respond to certain things and how officials respond and stuff like that or Madigan and a whole lot of other officials and stuff like that, and it's like favoritism, and you know that.

Here, you can do this here and you can be doing this for 40 years and you get caught, and you get tapped on the wrist. But you can do another crime and by you being a have not, you got the haves and the have nots, you be treated totally different though. And we know that. You been on that bench and then by you having your clerkship and the places that you've been in your life doing your trial and tribulations, I'm talking about with Clarence Thomas and the whole other bunch of individuals that you been doing -- dealing with far as on your clerkship, hey, you -- you -- you is well rounded in the information that you acquired far as law.

So, I mean, by you being seasoned in your area, in your law, you know the law. I can't say that you don't know the law 'cause I know you know the law. And you know when things ain't right, and you know that. You could feel it in your heart. You a woman. God gave the woman intuition. Yeah, he gave y'all intuition. And y'all can feel it in y'all heart. Y'all can feel the wrong energy though.

You ain't feeling no bad energy from me.  Yeah, I speak, I'm boastful sometime and I talk out occasionally on the things that I feel are coming across the wrong way.  I'm getting the wrong energy, I'm giving it back.  But I'm giving it back, I ain't giving it back, like, oh, yeah, I'm going to kill you.  I ain't trying to kill you.  I'm going to die, but I ain't got to speed it up though.

You think I like jail.  I don't like jail, but if somebody attack me, I'm just finna and trying to protect myself.  It's just like her saying when I lied to the special agents.  Lying to the special agents, they lied to me.  I lied to them.  They asked me a question.  Everything they asked me, and they sitting right there, I answered it.  Whether they wanted me to say what they wanted me to say, oh, okay, that's a horse of another story, but I answered everything that they requested me to answer though without even having a word about if it's going to come back and bite me.

But I answered it though.  So I'm talking about if you trying -- if you trying to approach me and you trying to approach me in a manner where you trying to take my freedom because you taking my -- my -- my life away from me by saying that I lied to you.  Well, if that was the case, if you felt I lied to you, okay, and you asked me these questions and start -- and then you didn't get the right answer, okay, you say I lied.  But can you prove I lied?  No, you can't prove it.

Was you there? No, you wasn't there when the incident occurred.

So then you say the letter that was addressed to her, the anonymous letter, okay, you use it as though it was hearsay. How is that possible? I can't make nobody do nothing they don't want to do. I ain't got no gun on him. I ain't got no knife on him. I can't make nobody -- and the reason I asked the special agent from Virginia, the FBI lady about the DNA, I said -- I said -- I said, excuse me, can the DNA be compromised by a Q-tip swab, and the lady said, yes, they can. And that's all I wanted, some clarity though.

And, yeah, I did things in my life and I wasn't proud of, okay, but I'm surviving, and -- and I'm trying to make ends meet, but, okay, you say selling drugs or you say stealing or you say robbing, that's bad. But here is the Federal Bureau of Investigation documents on the Hobbs Act robbery or allegedly supposed to happen and each one of the witnesses say, and I'm right there this close to them allegedly, and they all say I wasn't the one. But I had a guy that was named Marlon Jude had did a proffer on me because the -- the -- Rubenstein made a deal with him saying that he'll cut him some time and he'll release him, and -- and that's all he wanted him to -- to do a proffer on me. Turn on me.

And so I'm saying he wanted him to turn on me, so now in the event of me filing the motion for consideration for my

compassionate relief, I said, and the reason why I said, I'll say it again and I'll say it without stuttering because Ruben -- Corey Rubenstein had a problem with me because, okay, far as his ego, and the reason why I say that is because here a man writ me into court, leave me in -- in Oklahoma, knowing that I supposed to be in court, but he writ me into court to sabotage me because if I don't respond within a certain criteria of time on my motion for compassionate relief, the Judge Leinenweber is going to deny it.

And so if he put me in motion and he put me in this place, they put me in this place, then put me in this place, now he's circumventing me because now the mail got to catch up with you, Your Honor. So now when the mail catch up with me, they transfer me where I was at in Greenville and they move me down here to MCC, so now I don't have anything because they don't let you transfer with your documents though. You got to just bring your personal body. That's it.

So now I'm down here with nothing. So here I don't even have mail, so I got to wait until the mail catch back up with me so when it gets back up with me, then when I answer, I answer it past the criteria of the time, and so now they denying it because I didn't answer it according to the rule.

So by me not doing it, I say, okay, I file a motion for reconsideration. So Judge Durkins allowed me to present it, and so he -- he allowed me to present it. So now by me not

having or explaining to them about the M bank, because I didn't know nothing about it though 'cause you don't even know the law or understand the statutes and understand immorality and all the other stuff, when you forced and put in a position that you got to really fend for yourself in that community though.

So by me not asking for M bank, three judges heard on the panel, and they denied it. Yeah, they deny it, but I got everything in black and white, Your Honor. I brought you a whole complete package over here though about everything that happened from 2019 till now, everything, even the incident with the special agent, even the incident with Danielle Stern, with Corey, with everybody though, with Jon Woods, with Judge Leinenweber. I brought everything here today, with the police how they treat me, what drug they gave me.

They gave me a COVID drug in MCC saying if I didn't take it, that they was going to take these things from me, these perks from me, meaning that I wasn't going to be allowed to go to commissary. I wasn't going to go to be allowed to go outside, and they was going to put me behind the door.

So I took this drug and not knowing the effects in it, so I wrote the scientist, Dr. Wolf, and when I wrote her, she wrote me back and she stated that the Johnson & Johnson vaccine is the worst vaccine in the whole bunch, and she say that this drug got herpes in it. She say that this drug got -- it caused blisters, ranges of blisters, and she said caused rashes and

shingles and everything.

So I had added this in my compassionate relief, and I added a whole lot of other things in my compassionate leaf -- I mean relief, but Corey Rubenstein put the person who did a proffer on me inside my compassionate relief as though me and him doing it together. I wouldn't have messed with him with a 10-foot pole when the man did a proffer on me.

I didn't know what a proffer was. Only thing I knew about when somebody turned state's evidence on you or they turn on you or they snitch on you and all that. But when they say proffer, it's a whole different world I had to get accustomed to. I didn't know nothing about that.

I ain't had nobody in this courtroom. I ain't had no -- no -- no -- probation officer. I ain't got no problem with none of y'all. But what I do want, I want to be treated fair, and when I was up there when I pleaded guilty to you, Your Honor, hey, I was scared. You know why I was scared though? Because I ain't trust you. I ain't trust your judgment though because when you was denying everything that I was trying to say or everything I was trying to present, I took it, like, okay, she finna dismiss everything.

But if I could have put on my same story with everything I had, the jury would have looked at me totally different though. Totally different. You would have looked at me totally different, too, because I know in your heart though,

hey, you want to be treated fair. You want to be treated fair. Everybody want to be treated fair.

If I'm going to be treated fair, hey, my energy change. I know I'm-a die, but I ain't trying to speed up, like I saying before. But, look here, I mean, just be honest with me. How long do you think a black man live in a community infested with all the crime and everything that's in the community though. Let's be realistic though. I done been shot seven times by this police who robbed me and was all right because, hey, they protect they self. And that's a known fact.

I got my history right here. I'm talking about everything that could possibly happen to me, it didn't happen to me though. By the grace of God I was spared.

I looked you up, Your Honor. I know your whole portfolio. I'm talking about with University of Chicago, Chicago State and all that. Everything. And I'm going to look up anybody because, first of all, I'm trying to -- I'm trying to have a remedy so I could save myself.

Hey, I just had new grand babies though during the time that I been incarcerated though. I don't even know them. I just had -- I just had grand babies that got killed I could have saved. I was taking care of my family.

The police robbed me for $2.5 million, Your Honor, and I made it selling stuff from -- from -- from in two months, I made a million dollars selling items for $4 apiece, 250 items,

Your Honor, and then I took it, and I executed it and started selling gold dust for $24,500 a key. And the first thing they say, oh, he's selling keys, but it wasn't keys of narcotic. It was keys of gold dust, and I was having it transferred and back to here because minerals you don't get taxed on.

So it was a problem there. So I didn't cry and say, oh, I'm-a kill these police because they took the two. I had to chop it up. I had to bite the bullet though. Just in jail, I just brought -- my grandson on the phone talking to me, he fight his own, just his birthday. He say, hey, grand daddy. And I say how you doing, happy birthday or something, happy birthday to him. I say you all right? He said no, grand daddy. You saying you was going to buy me a dog. So I brought him a a dog, a micro Bully for $500 but it cost me $2,000. So I brought the dog for him. So after I brought the dog, the SIS lady inside the Metropolitan Correction, she called DEA and the FBI on me and say I was trying to circumvent the Metropolitan Correction, and I was trying to get micro bullets inside the place. Micro bullets.

And I say micro -- for what, what I'm going to spit them at somebody? And so if it wasn't the lady downstairs, the lieutenant and explain to her that her sister raise micro Bullies, the little dogs, the micro dogs, and she was mad because she wanted to get me for something though.

So, hey, I'm against the odds. I'm down in Kentucky.

They pulling -- the white people, the officers though, country, they pulling black people hair out from the roots, and it's okay because they take them in blind spots. They stab them, leaving guys in the cell. And you think you wouldn't have -- if I did write the letter, I would have wrote the letter and -- and -- and convinced the judge because I'm saying I didn't want to stay in jail. I didn't want to be in jail. I don't like jail. And I ain't never hurt nobody.

If -- if -- if you went to the county jail and talked to some of the nurses in the county jail or Weiler's Hospital, and you know what I used to do? I used to go down there and donate food, money, and I buy children presents. I'm not no tyrant. I'm not no bad guy. I ain't never been bad. I wasn't raised up like that.

And I got a multi background family. I got Europeans in my family, Asians, my mother. I got everything in my family. So it ain't like, oh, I don't -- I don't -- I don't know the person of -- I don't know the person. I'm like this here, however you treating me, I'm going to treat you back like that.

I ain't no bad guy. And I don't try to disrespect nobody really though because I believe in this here though. I believe and -- and when you treat somebody right, they'll reciprocate that back to you though. Even if they don't though, you can't worry about that because that's minute,

that's small.

I'm not trying to worry about, oh, I'm-a get her back. I ain't worried about that. I ain't worried about none of that, Your Honor. I'm trying to -- I'm trying to hit the door. I'm trying to get that way, and then I was this here every time I was telling Judge Leinenweber about I want to go to my son's funeral or my nephew funeral or something like that, Corey was circumventing me saying, oh, Your Honor, he bad, he woo-woo, but they letting everybody else go. And Corey allowing this to happen though. So I'm saying is this just me?

So, I mean, it just -- it just came to the point where I'm talking about all this stuff was in me, though, about how they was treating me though.

So that's all that was, Your Honor. I ain't no bad guy though. You can believe me though. If I seen you outside and on the street or something like that and you was getting mugged and by me, just me and you in here, I help you. I ain't got no problem with you. Even though you finna give me my sentence, I ain't got no problem with you. You just doing your job. I understand that.

And she was doing her job. I understand that. But I don't want to be -- I don't want -- I don't want to be prosecuted. I don't want to be attacked for something that y'all or they really didn't understand or don't know nothing about though.

Because when I was in the USP McCreary, you got guys that you ain't never met from all over this world, and you got guys that don't like you for whatever reason though. You ain't never did nothing to them though. They just don't like you. You might go to the commissary or you might look like this here, you might talk like this here, you might be doing this here, and they just got animosity in their heart for no reason.

So I'm fighting all that. It's like -- it's another world inside there. So if you ain't fit to handle that world and you can't -- and you ain't capable of dealing with that world, hey, the strong survive, they're going to push the weak aside. And they doing it every day, Your Honor.

And so I understand you say that, okay, the people, I mean what people? I'm talking about I'm not hurting no people. I ain't out there hurting nobody. I know I did what I did, far as me with the incident about the Hobbs Act robbery according to what they say. But I'm saying I didn't -- I didn't put my hand on nobody, I didn't -- I didn't -- I didn't -- I didn't do no kind of thing where it would be degradable to me myself personally or to them, but I understand what y'all saying, but, I mean, I'm not the person that she stating that I am to be or what I'm capable of doing.

I'm not even worried about Danielle. And then let me tell you for the record, I was only telling Danielle that, hey, look here, hey, you and my daughter got the same name. The

same exact name.  It's in my PSI.  That's all I was saying. I'm-a write you back and let you know I tell her -- I told special agents that, they asked me the question.  What was that you was going to send Danielle?  I say, oh, man, I probably would have sent her a card.

Yeah, I mean, I ain't the person that people portray me to be or trying to paint the picture of me though.  I ain't no bad guy, Your Honor.  I ain't no bad guy.  I know I did some things that -- that -- that wasn't feasible or wasn't appealing or whatever in my lifetime, but, I mean, far as just -- just doing something, people were just being vindictive or obnoxious though, I don't do that though, Your Honor.  I don't do that.

THE COURT:  Okay.  Why don't we -- so let me just ask, Mr. Bowden, do you have anything else to say?

THE DEFENDANT:  No, not really.

THE COURT:  Okay.  Thank you.

So why don't we take a break now.  It's -- we've been going for a while.  I could use a short break.  If we could be back in, like, 15 to 20 minutes.  It's 1:05.  So why don't we just say 1:25 to be safe.  Thanks.

(Recess at 1:05 p.m., until 2:08 p.m.)

THE CLERK:  22 CR 143, United States v. Glenn Bowden.

THE COURT:  Okay.  Thank you, everybody.  And my apologies for the delay.

Let me now turn to the sentencing factors and just

give you my analysis.

So the factors that I'm applying today, as I do at every sentencing, come from a statute, 18 U.S.C. 3553(a). Under that statute, I must consider the nature and circumstances of the offense and the history and characteristics of the defendant, and I must impose a sentence that is sufficient but not greater than necessary to comply with the purposes of sentencing, which are set forth in the statute.

Those purposes include the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, the kinds of sentences available, the guidelines sentencing range, any guidelines policy statement, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

So those are the factors that I'm applying here, as at every sentencing. Instead of analyzing the factors in the order that they're listed in the statute, I'm just going to discuss aggravating and mitigating factors, meaning aggravating factors are those that cut in favor of a higher sentence. Mitigating factors are those that cut in favor of a lower sentence. Ultimately, whether they're aggravating or

mitigating, they're all factors that get at those 3553 factors.

The aggravating and mitigating factors in this case, the fact -- or the parties have already discussed them thoroughly in the sentencing memos, as well as -- as well as in the arguments today at the hearing, so none of them are a surprise. It's just a matter of trying to -- to balance them as required by the statute.

The aggravating factors, as the government explained, they are the seriousness of the offense, which is extraordinarily serious. The government's right that the threat to the probation officer and the anonymous threat to the probation officer, it's needless to say that that's extremely serious.

And the letter is just -- you know, at various points, one of my just concerns about this is that, Mr. Bowden, you've -- I don't know that it has totally sunk in how bad that letter is. It's -- I mean, now is not the first time I've seen it. The first time I saw it, which is now some time ago, I mean, it was incredibly shocking, but even now it is. It's incredibly graphic. It is a -- it's -- I've not seen anything like that in terms of a threat.

And it is just beyond. It's beyond unacceptable. It is -- it is not in any way okay. It's not some kind of joke. It's not some kind of -- there is not -- there's just no excuse for that kind of letter, to send that to anybody, but

especially to a probation officer who was just doing her job.

And, you know, I think at times I -- you know, one thing I'm trying to factor in and to consider as part of just the history and characteristics of Mr. Bowden is that occasionally, I think, you know, I just get the impression that you sometimes misperceive things that people are doing which are just part of their job that are normal parts of the legal process, for example, as somehow personal attacks when, in fact, that's not at all what they were. That's not how they were intended, and it just is simply a very -- it's a wrong, inaccurate understanding of what people were doing.

So the whole thing that started this all off, where Ms. Stern made a sentencing recommendation and then Judge Leinenweber wound up giving a lower sentence, there's nothing about her recommendation that was personal or that, you know, she didn't -- she didn't do anything wrong. That's just how the process works.

And at the sentencing hearing, the judge calculates the guidelines, and my understanding is it just was a -- you know, just as we talked about today, there was an issue with the calculation of the guidelines. Well, those kinds of details, they happen. I mean, that happens in -- you know, not infrequently. It happens.

Sometimes the calculation is exactly as it was in the PSR. Other times, it's not. And it's just a normal, expected

part of the process. The probation officer is doing their best to get it correct. But that's why we have a whole process with the PSR that does a lot of -- they gather a ton of information, the probation officer does. That's part of their job, and they do their best to get it accurate.

Then the parties have a chance to make corrections if they want, and then the judge makes the final calculation. And it's not because they were out to get you or anything like that. It's just how the process works.

And so sometimes I -- you know, I get the sense that perhaps you misperceived something where someone was doing their job and did not have any kind of intent to get you as a personal -- something's personal about it. And I -- you know, from everything I've seen, I'm confident, I assure you, you know, Ms. Stern was acting totally professionally. There wasn't anything wrong with what she did at all, and that -- she was just acting as a conscientious probation officer.

And so to get in response that incredibly graphic and gross threat and terrifying threat is --

THE DEFENDANT: It wasn't a threat.

THE COURT: -- it's very hard to capture in words how uncalled for and undeserved and very wrong that was.

So I -- and the government's totally correct that our system depends, and, you know, the overall functioning of the system depends on -- the probation officers are a critical part

of that, both in their role as it relates to sentencing and preparing the probation investigation report, the Presentence Investigation Report, or PSR, gathering all the detailed information so that we can make -- we, the judges, can make an accurate assessment of those 3553(a) factors that, you know, that are about the nature and circumstances of the offense, the history and characteristics of the defendant, a lot of that information, including the mitigating information that can lower the sentence and that can really affect and help, can cut in favor of a lower sentence, it's the probation officer's job to gather that information.

And so that's all she was doing, and that was just -- it was -- it was incredibly wrong to get that letter in response to what she did, which was totally -- everything she was doing was totally correct, and to get that threat in response is just completely wrong, and I don't know how else to put it. It's quite outrageous.

So that offense is really serious. Now -- and it is also underlined by the victim impact letter, which was very, very powerful. She -- I mean, the letter basically just speaks for itself in terms of the impact on her, and it's really -- it's aggravating.

The fact that you continued seeking information about Ms. Stern right before the last sentencing, I already discussed that earlier, that's also very troubling because it's, again,

in the timeline of this case, that's very late. It's right before the May scheduled sentencing, which then was continued to today.

So this is long after we've already been through the trial, the plea, and then quite a bit of time after that, this is still occurring, seeking information about Ms. Stern. It's just not -- it reflects a lack of acceptance of responsibility and a lack of respect for the -- the probation officer and the -- the law and the process. So that's very aggravating.

The other convictions, those are also serious. I mean, the fabricated chaplain letter, it is -- it was an obstruction of justice. And it -- again, if that sort of thing is allowed to happen without any consequences, it really undermines the whole system. The same with lying to the FBI. So those are also serious offenses.

The other aggravating factor is criminal history. So I did see in the criminal history, which is in the PSR, the fact that you've had prior crimes that involve violence and --

THE DEFENDANT: What crimes?

THE COURT: -- have had prior sentences, including a state sentence, which was I believe you wound up serving, the face length of the sentence was higher than this, but you I believe wound up serving around 14 years in state custody after the tire store robbery in your 30s.

I saw an earlier offense from around age 18, which was

also some sort of armed theft or robbery of taking a TV from someone's residence while armed. So, I mean, that's old enough where it wouldn't receive criminal history points. But the point is there's a pattern that goes back to a quite young age of these armed theft or robbery-type offenses. So that's age 18.

Another, the tire store robbery which resulted in the very long sentence at -- in your early 30s, and then again the Hobbs Act robberies, which was from 2019 and approximately age 58.

And so 2019, we're now in 2025, and so that's relatively -- I mean, it's not yesterday, but in the overall time frame, that's not all that long ago, and it also reflects that you were willing and able to do a violent crime at the age of 58, which is very concerning for the risk of future violence and danger to the public.

That case involved several robberies, the Hobbs Act case did, and those robberies were quite violent. It included victims being restrained and taken to back rooms and, again, at gunpoint. So I -- that is really troubling because that's an age where often you'll see people starting to age out. Instead, we have this happening at age 58 or approximately.

In addition, when the police tried to arrest you for that case, I saw there was a flight from the police which resulted in a vehicle chase, and so that's, again, more -- just

something else showing that at a, at the age of 58, continued willingness to engage in a flight from police, a vehicle chase.

So all of that's concerning because it's a substantial criminal history that includes prior lengthy sentences that did not deter you from this offense, and it also includes the commission of a violent crime or several violent crimes at around the age of 58.

In terms of the mitigating factors -- well, actually, let me continue with one other aggravating factor, which is just I don't -- I denied the acceptance of responsibility, and I -- I view that as an aggravating factor as well. I mean, I don't -- it's already accounted for in the guidelines calculation through the denial of those acceptance points, but it is -- it's not good. It is aggravating because if someone has accepted responsibility and is not trying to minimize the offense, then at least that reflects a recognition and a respect for the law, and if someone just hasn't accepted that yet, then it gives me less confidence that they're likely to make attempts to abide by the law in the future.

It's -- you know, if someone just doesn't accept that this was wrong, then it's -- how can I have any confidence that going forward you're not going to do more of this? And so I -- that's an unfortunate aggravating factor.

In terms of the mitigating factors, I -- I would say there is -- the defense is correct that your age is to some

degree a mitigating factor, although in a sense it cuts both ways, as I already explained. Based on just the track record in front of me, you've continued to commit until age 58, that was the year of the Hobbs Act robberies, and they did have a violent -- they were violent, and so I think that in that respect, your age is actually an aggravating factor.

But it is mitigating in the sense that, you know, perhaps at some point, you know, someone hopefully if they've -- even if they've not yet aged out, at some point, someone just becomes less or does -- just starts refraining from crime. So I would say to some degree, your age is mitigating.

I also -- in terms of mitigation, you do have some very tough circumstances in your background. I saw in the PSR about your mother and the fact that she basically abandoned family I think when you were 15, and so that's a horrible thing.

I -- I think the government's correct that at some point, you know, you can't trace all of -- you can't -- you have to -- at some point someone just needs to start -- you can't blame things on past circumstances, and in that way, I just, you know, there comes a point where, as the government pointed out, the seriousness of the offense and the basically life stage at which it's continuing to happen starts to outweigh mitigating factors about someone's background, so I --

but I do credit those circumstances, those really difficult background circumstances, as mitigating.

I mean, I think also in mitigation I -- you know, I would say what I mentioned earlier, which is just that perhaps there are some aspects of your reactions to different actions by other people that are based on a misperception. And, you know, perhaps that misperception is -- may not be -- aspects of that may not be, you know, your fault. It could be, for example, maybe you don't -- a lack of understanding of the legal system and how, you know, what's the normal thing that happens in a certain set of circumstances. Why does someone -- why does a particular person involved in the legal system act a certain way. You know, different -- different people who are involved in the sentencing process, why would they do this or that, as a non-lawyer and not having legal training, perhaps that would at least explain some of the misperceptions.

At the same time, there are many, many people who are going through the legal system and are not taking everything personally like that, and so it's not an excuse. It's also not -- at the end of the day, I don't, by acknowledging that as a mitigating factor, I don't in any way want to undermine the message that this was incredibly serious, and you can't -- that is in no way an excuse.

Not understanding the ins and outs of and details of the legal system is not an excuse to send a horrible letter

like that to a probation officer who, again, was just doing her job, nor is it an excuse to send the fake chaplain letter, nor is it an excuse to lie to the FBI.

You know, people unfortunately, you know, not everyone who goes through the system, I could understand that it would be, you know, an incredibly difficult process, especially for a non-lawyer, but it does not excuse that at the end of the day. So it is a mitigating factor, but it doesn't excuse.

Okay. So what does that mean in terms of the appropriate sentence? I -- you know, I think it's a tough one because there's very serious aggravating factors. I think the -- I think given the seriousness, I think the government's request is very, very reasonable to go above guidelines.

I just -- I think also that the high end of the guidelines is a very substantial period of time, and, you know, is also a strong -- a very strong message that this is unacceptable and whether the sentence is the high end of the guidelines or above guidelines, it's a long -- it's a lot of time.

And so I am inclined to basically go with the high end of the guidelines, which is an 87-month sentence consecutive to the existing sentence for the Hobbs Act robberies.

Before I proceed to impose the sentence, have I addressed the defendant's principal arguments in mitigation?

MS. BEZNER: Yes, Your Honor.

THE COURT: Do you have any objections to the procedure so far?

MS. BEZNER: No.

THE COURT: Okay. Let me then turn to -- let me ask the government if any comments before I proceed.

MS. MERIN: Nothing, Your Honor.

THE COURT: Okay. So I'm going to now pronounce the sentence. It is the judgment of the Court that you be committed to the custody of the Bureau of Prisons to be imprisoned for a total term of 87 months on Counts One, Two and Three of the indictment. The costs of incarceration -- and that's consecutive to the --

THE DEFENDANT: Yeah.

THE COURT: -- current sentence in the 2019 Hobbs Act robbery case.

MS. MERIN: Judge, that case number is 19 CR 924 if you need it.

THE COURT: Thank you.

Okay. So it's consecutive to -- the sentence in this case, the 87 months on Counts One, Two and Three of the indictment is consecutive to --

THE CLERK: I think it's a superseding indictment.

THE COURT: -- of the superseding indictment, thank you, is consecutive to the 19 CR 924 sentence.

The costs of incarceration are waived.

There's a $100 special assessment per count for a total of $300 that is due immediately.

There is no fine due to inability to pay.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years.

Within 72 hours of release from BOP custody, the defendant shall report in person to the Probation Office in the district to which defendant is released.

I've considered the 3553(a) factors, and they justify the conditions I discussed earlier.

And the costs of supervision are waived.

Mr. Bowden will be remanded to the marshal.

Is there a recommended designation?

MS. BEZNER: Just as close to home as possible.

THE COURT: Okay. I'll make that recommendation, as close to Chicago as possible. The BOP has the ultimate decision.

Mr. Bowden, let me advise you of your appellate rights.

Any notice of appeal must be filed within 14 days of the entry of judgment or within 14 days of the filing of a notice of appeal by the government. If requested, the clerk will prepare and file a notice of appeal on your behalf. If you cannot afford to pay the costs of an appeal or for

appellate counsel, you can apply to have the court waive the costs and appoint you a lawyer.

Let me ask defense counsel, is there anything further you'd like me to address?

Are there any objections or arguments that I did not adequately address?

MS. BEZNER: No. Thank you.

THE COURT: Anything further from the government?

MS. MERIN: Nothing, Your Honor.

THE COURT: Okay. Thank you, everybody.

MS. MERIN: Thank you.

(Concluded at 2:36 p.m.)

\* \* \* \* \*

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Kathleen M. Fennell*          *August 19, 2025*
Kathleen M. Fennell               Date
Official Court Reporter

# UNITED STATES DISTRICT COURT
Northern District of Illinois

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>**v.**<br><br>GLENN BOWDEN | ) **JUDGMENT IN A CRIMINAL CASE**<br>)<br>)<br>) Case Number:    1:24-CR-00143(1)<br>)<br>) USM Number:    54825-424<br>)<br>)<br>)<br>) Hallie M Bezner<br>) Defendant's Attorney |

**THE DEFENDANT:**

☒ pleaded guilty to count(s) One, Two and Three of the Superseding Indictment.

☐ pleaded nolo contendere to count(s)       which was accepted by the court.

☐ was found guilty on count(s)       after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section / Nature of Offense | Offense Ended | Count |
|---|---|---|
| 18:876.F Mailing Threatening Communications | 08/30/2019 | 1s |
| 18:1512A1.F Tamper W/Witness, Victim, Informant (Manslaughter) | 08/30/2019 | 2s |
| 18:1001.F Statements Or Entries Generally | 08/30/2019 | 3s |

The defendant is sentenced as provided in pages 2 through 8 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s)  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

July 8, 2025
Date of Imposition of Judgment

/s/Martha M. Pacold
Signature of Judge

Martha M. Pacold, United States District Judge
Name and Title of Judge

July 8, 2025
Date

App. 114

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
**87 months as to count 1s; 87 months as to count 2s; and 87 months as to count 3s, all such terms to run concurrently with each other; and the total term of 87 months shall run consecutively with defendant's sentence in *USA v. Bowden*, Case No. 19-cr-924 in the United States District Court for the Northern District of Illinois.**

☒　　The court makes the following recommendations to the Bureau of Prisons: It is recommended that the defendant be placed at an appropriate facility as close to Chicago, IL as possible.

☒　　The defendant is remanded to the custody of the United States Marshal.

☐　　The defendant shall surrender to the United States Marshal for this district:

　　☐　　at　　on

　　☐　　as notified by the United States Marshal.

☐　　The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

　　☐　　before 2:00 pm on

　　☐　　as notified by the United States Marshal.

　　☐　　as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows: _____

_____

_____

Defendant delivered on _____ to _____ at_____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

App. 115

## MANDATORY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3583(d)

Upon release from imprisonment, you shall be on supervised release for a term of:
**Three (3) years on Counts One, Two, and Three of the superseding indictment; all such terms to run concurrent.**

The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**
- ☒ (1) you shall not commit another Federal, State, or local crime.
- ☒ (2) you shall not unlawfully possess a controlled substance.
- ☐ (3) you shall attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, if an approved program is readily available within a 50-mile radius of your legal residence. [Use for a first conviction of a domestic violence crime, as defined in **§ 3561(b)**.]
- ☐ (4) you shall register and comply with all requirements of the Sex Offender Registration and Notification Act **(42 U.S.C. § 16913)**.
- ☒ (5) you shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.
- ☒ (6) you shall refrain from any unlawful use of a controlled substance AND submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release. [This mandatory condition may be ameliorated or suspended by the court for any defendant if reliable sentencing information indicates a low risk of future substance abuse by the defendant.]

## DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3563(b) AND 18 U.S.C § 3583(d)

**Discretionary Conditions** — The court orders that you abide by the following conditions during the term of supervised release because such conditions are reasonably related to the factors set forth in **§ 3553(a)(1)** and **(a)(2)(B), (C), and (D);** such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in **§ 3553 (a)(2) (B), (C), and (D)**; and such conditions are consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to **28 U.S.C. 994a**.
The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**
- ☐ (1) you shall provide financial support to any dependents if you are financially able to do so.
- ☐ (2) you shall make restitution to a victim of the offense under **§ 3556** (but not subject to the limitation of **§ 3663(a)** or **§ 3663A(c)(1)(A)**).
- ☐ (3) you shall give to the victims of the offense notice pursuant to the provisions of **§ 3555**, as follows: [ ]
- ☒ (4) you shall seek, and work conscientiously at, lawful employment or, if you are not gainfully employed, you shall pursue conscientiously a course of study or vocational training that will equip you for employment.
- ☐ (5) you shall refrain from engaging in the following occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, or engage in the following specified occupation, business, or profession only to a stated degree or under stated circumstances; (if checked yes, please indicate restriction(s)) [ ].
- ☒ (6) you shall not knowingly meet or communicate with any person whom you know to be engaged, or planning to be engaged, in criminal activity and shall not:
    - ☐ visit the following type of places: [ ].
    - ☒ knowingly meet or communicate with the following persons: United States Probation Officer Danielle Stern.
- ☒ (7) you shall refrain from ☐ any or ☒ excessive use of alcohol (defined as ☒ having a blood alcohol concentration greater than 0.08%; or ☐ [ ]), and from any use of a narcotic drug or other controlled substance, as defined in **§ 102** of the Controlled Substances Act (**21 U.S.C. § 802**), without a prescription by a licensed medical practitioner.
- ☒ (8) you shall not possess a firearm, destructive device, or other dangerous weapon.
- ☒ (9) ☒ you shall participate, at the direction of a probation officer, in a substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year.
    - ☒ you shall participate, at the direction of a probation officer, in a mental health treatment program, and shall take any medications prescribed by the mental health treatment provider.
    - ☐ you shall participate, at the direction of a probation officer, in medical care; (if checked yes, please specify: [ ].)

App. 116

☐ (10) (intermittent confinement): you shall remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling _____ [no more than the lesser of one year or the term of imprisonment authorized for the offense], during the first year of the term of supervised release (provided, however, that a condition set forth in **§3563(b)(10)** shall be imposed only for a violation of a condition of supervised release in accordance with **§ 3583(e)(2)** and only when facilities are available) for the following period _____.

☐ (11) (community confinement): you shall reside at, or participate in the program of a community corrections facility (including a facility maintained or under contract to the Bureau of Prisons) for all or part of the term of supervised release, for a period of _____ months.

☐ (12) you shall work in community service for _____ hours as directed by a probation officer.

☐ (13) you shall reside in the following place or area: _____, or refrain from residing in a specified place or area: _____.

☒ (14) you shall not knowingly leave from the federal judicial district where you are being supervised, unless granted permission to leave by the court or a probation officer. The geographic area of the Northern District of Illinois currently consists of the Illinois counties of Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and Winnebago.

☒ (15) you shall report to the probation office in the federal judicial district to which you are released within 72 hours of your release from imprisonment. You shall thereafter report to a probation officer at reasonable times as directed by the court or a probation officer.

☒ (16) ☒ you shall permit a probation officer to visit you ☒ at any reasonable time or ☐ as specified: _____ ,
　　　　　☒ at home　　　☒ at work　　　☒ at school　　　☒ at a community service location
　　　　　☒ other reasonable location specified by a probation officer
　　　☒ you shall permit confiscation of any contraband observed in plain view of the probation officer.

☒ (17) you shall notify a probation officer within 72 hours, after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. You shall answer truthfully any inquiries by a probation officer, subject to any constitutional or other legal privilege.

☒ (18) you shall notify a probation officer within 72 hours if after being arrested, charged with a crime, or questioned by a law enforcement officer.

☐ (19) (home confinement)
　　　☐ (a)(i) (home incarceration) for a period of __ months, you are restricted to your residence at all times except for medical necessities and court appearances or other activities specifically approved by the court.
　　　☐ (a)(ii) (home detention) for a period of __ months, you are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the probation officer.
　　　☐ (a)(iii) (curfew) for a period of __ months, you are restricted to your residence every day.
　　　☐ from the times directed by the probation officer; or ☐ from __ to __.
　　　☐ (b) your compliance with this condition, as well as other court-imposed conditions of supervision, shall be monitored by a form of location monitoring technology selected at the discretion of the probation officer, and you shall abide by all technology requirements.
　　　☐ (c) you shall pay all or part of the cost of the location monitoring, at the daily contractual rate, if you are financially able to do so.

☐ (20) you shall comply with the terms of any court order or order of an administrative process pursuant to the law of a State, the District of Columbia, or any other possession or territory of the United States, requiring payments by you for the support and maintenance of a child or of a child and the parent with whom the child is living.

☐ (21) (deportation): you shall be surrendered to a duly authorized official of the Homeland Security Department for a determination on the issue of deportability by the appropriate authority in accordance with the laws under the Immigration and Nationality Act and the established implementing regulations. If ordered deported, you shall not remain in or enter the United States without obtaining, in advance, the express written consent of the United States Attorney General or the United States Secretary of the Department of Homeland Security.

☒ (22) you shall satisfy such other special conditions as ordered below.

☒ (23) You shall submit your person, property, house, residence, vehicle, papers [computers (as defined in 18 U.S.C. 1030(e)(1)), other electronic communications or data storage devices or media,] or office, to a search conducted by a United States Probation Officer(s). Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer(s) may conduct a search pursuant to this condition only when reasonable suspicion exists that you have violated a condition of your supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

☐ (24) Other:

App. 117

**SPECIAL CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C. 3563(b)(22) and 3583(d)**

The court imposes those conditions identified by checkmarks below:

**During the term of supervised release:**

☐ (1) if you have not obtained a high school diploma or equivalent, you shall participate in a General Educational Development (GED) preparation course and seek to obtain a GED within the first year of supervision.

☐ (2) you shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision.

☒ (3) you shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least 20 hours of community service per week at the direction of the probation office until gainfully employed. The total amount of community service required over your term of service shall not exceed 200 hours.

☐ (4) you shall not maintain employment where you have access to other individual's personal information, including, but not limited to, Social Security numbers and credit card numbers (or money) unless approved by a probation officer.

☐ (5) you shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless you are in compliance with the financial obligations imposed by this judgment.

☐ (6) you shall provide a probation officer with access to any requested financial information requested by the probation officer to monitor compliance with conditions of supervised release.

☒ (7) within 72 hours of any significant change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments, you must notify the probation officer of the change.

☒ (8) you shall file accurate income tax returns and pay all taxes, interest, and penalties as required by law.

☐ (9) you shall participate in a sex offender treatment program. The specific program and provider will be determined by a probation officer. You shall comply with all recommended treatment which may include psychological and physiological testing. You shall maintain use of all prescribed medications.

    ☐ You shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. You shall consent to the installation of computer monitoring software on all identified computers to which you have access and to which the probation officer has legitimate access by right or consent. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. You shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

    ☐ The cost of the monitoring shall be paid by you at the monthly contractual rate, if you are financially able, subject to satisfaction of other financial obligations imposed by this judgment.

    ☐ You shall not possess or use at any location (including your place of employment), any computer, external storage device, or any device with access to the Internet or any online computer service without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system

    ☐ You shall not possess any device that could be used for covert photography without the prior approval of a probation officer.

    ☐ You shall not view or possess child pornography. If the treatment provider determines that exposure to other sexually stimulating material may be detrimental to the treatment process, or that additional conditions are likely to assist the treatment process, such proposed conditions shall be promptly presented to the court, for a determination, pursuant to **18 U.S.C. § 3583(e)(2),** regarding whether to enlarge or otherwise modify the conditions of supervision to include conditions consistent with the recommendations of the treatment provider.

    ☐ You shall not, without the approval of a probation officer and treatment provider, engage in activities that will put you in unsupervised private contact with any person under the age of 18, and you shall not knowingly visit locations where persons under the age of 18 regularly congregate, including parks, schools, school bus stops, playgrounds, and childcare facilities. This condition does not apply to contact in the course of normal commercial business or unintentional incidental contact

    ☐ This condition does not apply to your family members:     [Names]

    ☐ Your employment shall be restricted to the judicial district and division where you reside or are supervised, unless approval is granted by a probation officer. Prior to accepting any form of employment, you shall seek the approval of a probation officer, in order to allow the probation officer the opportunity to assess the level of risk to the community you will pose if employed in a particular capacity. You shall not participate in any volunteer

activity that may cause you to come into direct contact with children except under circumstances approved in advance by a probation officer and treatment provider.

☐ You shall provide the probation officer with copies of your telephone bills, all credit card statements/receipts, and any other financial information requested.

☐ You shall comply with all state and local laws pertaining to convicted sex offenders, including such laws that impose restrictions beyond those set forth in this order.

☒ (10) you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings.

☒ (11) you shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the prior permission of the court.

☐ (12) you shall pay to the Clerk of the Court $_____ as repayment to the United States of government funds you received during the investigation of this offense. (The Clerk of the Court shall remit the funds to _____ (list both Agency and Address.)

☐ (13) if the probation officer determines that you pose a risk to another person (including an organization or members of the community), the probation officer may require you to tell the person about the risk, and you must comply with that instruction. Such notification could include advising the person about your record of arrests and convictions and substance use. The probation officer may contact the person and confirm that you have told the person about the risk.

☐ (14) You shall observe one Reentry Court session, as instructed by your probation officer.

☐ (15) Other:_____

App. 119

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $300.00 | $.00 | $.00 | $.00 | $.00 |

☐     The determination of restitution is deferred until     . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐     The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

    If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to **18 U.S.C. § 3664(i)**, all nonfederal victims must be paid before the United States is paid.

☐     Restitution amount ordered pursuant to plea agreement $

☐     The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant **to 18 U.S.C. § 3612(f)**. All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to **18 U.S.C. § 3612(g)**.

☐     The court determined that the defendant does not have the ability to pay interest and it is ordered that:

       ☐     the interest requirement is waived for the     .

       ☐     the interest requirement for the     is modified as follows:

☐     The defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations.

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☒ Lump sum payment of $300.00 due immediately.

    ☐ balance due not later than    , or

    ☐ balance due in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal     *(e.g. weekly, monthly, quarterly)* installments of $    over a period of    *(e.g., months or years)*, to commence    *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal     *(e.g. weekly, monthly, quarterly)* installments of $    over a period of    *(e.g., months or years)*, to commence    *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within    *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if Appropriate |
|---|---|---|---|

**See above for Defendant and Co-Defendant Names and Case Numbers (*including defendant number*), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.**

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.